**Burdette WOODS, Petitioner,**

v.

**Donald CLUSEN, Respondent.**

**No. 84–C–1377.**

United States District Court,
E.D. Wisconsin.

March 13, 1985.

William J. Tyroler, Asst. Public Defender, Milwaukee, Wis., for petitioner.

Marguerite Moeller, Madison, Wis., for respondent.

DECISION and ORDER

MYRON L. GORDON, Senior District Judge.

"The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated."

*Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1976)

Following his plea of guilty, the petitioner, Burdette Woods, was convicted on charges of second degree murder and manslaughter in the Shawano county circuit court on August 20, 1981. The petitioner appealed his conviction on the ground that the trial court erroneously denied his motion to suppress a confession given to state investigators. The Wisconsin Supreme Court affirmed on March 27, 1984. *State v. Woods*, 117 Wis.2d 701, 345 N.W.2d 457 (1984). Mr. Woods now petitions for habeas corpus relief pursuant to 28 U.S.C. § 2254. Relief will be granted.

The facts are not seriously disputed. On September 10, 1979, Henry and Beryl Schwab were beaten to death in their Shawano county home. Mr. Woods, 16 years 9 months old at the time, had been seen near the Schwab home on the day or the day after the murders. Observers later noticed Mr. Woods watching the police investigation at the scene of the murders. By September 19, 1979, Mr. Woods was the prime suspect.

In the course of their investigation, police received reliable information indicating that Mr. Woods may have stolen a chain saw. Lacking probable cause to arrest Mr. Woods for the murders, sheriff's deputies decided to arrest him on the theft charge with the intention of questioning him about the Schwab case. By this time, Shawano county authorities had obtained the assistance of Wendell Harker and Robert Ankenbrandt, agents of the Wisconsin Department of Criminal Investigation.

On September 23, 1979, Mr. Woods and his brother were living with their grandparents in a trailer. On that date at about 7:30 a.m., Shawano deputies Trombi and Thorpe went to the trailer and were admitted by Mr. Woods' brother. The brother led the deputies to a bedroom where they found Mr. Woods asleep. One of the deputies woke the petitioner and placed him under arrest. Mr. Woods was handcuffed and put in the deputies' squad car.

On the way to sheriff's headquarters, Officer Trombi read Mr. Woods his *Miranda* rights and asked whether he understood them. Mr. Woods indicated that he did. Asked by Officer Trombi whether he wished to consult with an attorney, Mr. Woods nodded negatively. Officer Trombi then asked the petitioner whether he wished to answer questions or to make a statement. Mr. Woods did not respond.

After arriving at sheriff's headquarters, Mr. Woods was fingerprinted, photographed, and asked to provide background information. The petitioner was also required to remove his clothes and put on jail coveralls. He was not issued shoes and socks to replace his own, which he had taken off. At the end of the booking procedure, David Gage, a juvenile intake worker, asked the petitioner whether he had been read his rights. The petitioner responded affirmatively. Mr. Gage then asked whether the petitioner wished to consult with an attorney. The petitioner answered "No." The booking process lasted about 45 minutes.

When the booking process was completed, Officers Thorpe and Trombi took Mr. Woods into an "interrogation room." Mr. Woods was seated at a table without handcuffs, dressed in jail coveralls, barefoot. On the table one or two feet from Mr. Woods and clearly visible were gruesome photographs of the murder victims. Officers Thorpe and Trombi did not issue *Miranda* warnings before beginning to ask Mr. Woods questions. Nor did they inquire whether Mr. Woods was willing to submit to interrogation.

Officers Trombi and Thorpe interrogated the petitioner for 15 to 20 minutes. Officer Trombi told the petitioner that he knew that the petitioner had committed the murders and that things would be "better" or "go easier" if he talked. Officer Thorpe told Mr. Woods that police had evidence sufficient to prove his guilt, although Officer Thorpe later admitted that such evidence was lacking. At one point during the interrogation, Officer Trombi asked why the petitioner had gone into the woods near the victims' home the day after the murders. The petitioner responded, "I never went in the Woods the next day." The

petitioner was otherwise mute throughout the interrogation, despite pleas of "Don't you want to talk about it now?" and "Do you want to talk to us?" Officer Thorpe testified that "all [the petitioner] would do is stare down at the wall." Although unresponsive, the petitioner was not unaffected by the interrogation; Officer Trombi testified that he became "quite emotional."

After Officers Trombi and Thorpe had completed their interrogation, they turned the petitioner over to agents Harker and Ankenbrandt, remarking to them that the petitioner "was not making any statements." Agent Harker asked Mr. Woods whether he had been informed of his rights, and Mr. Woods responded affirmatively. The state agents did not repeat the petitioner's constitutional rights, nor did they obtain the petitioner's consent before they began to ask questions.

Agents Harker and Ankenbrandt interrogated Mr. Woods for 20 to 30 minutes without eliciting any response. Agent Ankenbrandt later testified that he understood that the petitioner did not intend to answer questions:

Q. It appeared to you that he just didn't want to talk to you, isn't that right?

A. Yeah. He wasn't going to say anything.

Q. That he was exercising his right to remain silent, isn't that right?

A. Yes. He wasn't speaking.

Q. And you took from that he was exercising his right to remain silent?

A. Sure, everyone has that.

Tr. 47

During the interrogation, agents Harker and Ankenbrandt tried to persuade the petitioner that they knew he was guilty. At one point, agent Ankenbrandt showed the petitioner a fingerprint card with two prints circled in red and the wallet of one of the murder victims. Agent Ankenbrandt testified that he tapped these items and told the petitioner, "this is what is going to pin you down; or this is what's going to hang you, or something to that effect." Tr. 41. In fact, the petitioner's prints had not been found on the wallet. Agent Ankenbrandt testified that he intentionally deceived the petitioner in an attempt to elicit a confession.

After 20 to 30 minutes of interrogation by agents Harker and Ankenbrandt, the petitioner began to cry. Agent Harker then put his hand on the petitioner's shoulder in a "fatherly fashion." At that point, Mr. Woods broke his silence and confessed to the Schwab murders. In light of the constitutional principles established by the United States Supreme Court, it is clear that the petitioner's right not to incriminate himself was violated, and the state court erred when it declined to suppress his confession.

## DISCUSSION

On habeas corpus review, the factual findings of the state court are presumed to be correct. 28 U.S.C. § 2254(d). The facts to which the presumption applies are "basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators.'" *Cuyler v. Sullivan*, 446 U.S. 335, 342, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980), quoting *Townsend v. Sain*, 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963). Whether the petitioner waived his fifth amendment rights is a mixed question of fact and law requiring an independent determination by this court. *Brown v. Allen*, 344 U.S. 443, 507, 73 S.Ct. 397, 97 L.Ed. 469 (1953) (opinion of Frankfurter, J.). *See also Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

The fifth amendment's guarantee that "[n]o person ... shall be compelled in any criminal case to be a witness against himself" is applicable to the states. *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The fundamental idea of the privilege against self-incrimination is that "our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, sim-

ple expedient of compelling it from his own mouth." *Miranda v. Arizona,* 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966). Only statements which a suspect makes "in the unfettered exercise of his own will" may be used against him. *Malloy,* 378 U.S. at 8, 84 S.Ct. at 1493.

▪ When a young person in custody is cut off from family and friends and subjected to questioning in a police-dominated atmosphere, there is a potential deprivation of his privilege against self-incrimination. "[T]he very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weaknesses of individuals." *Miranda,* 384 U.S. at 455, 86 S.Ct. at 1617. Recognizing that incommunicado interrogation by police "is at odds with one of our nation's most cherished principles—that the individual may not be compelled to incriminate himself, ..." *Id.,* at 457–58, 86 S.Ct. at 1619, the *Miranda* Court effectively established a presumption against the practice.

Despite its dangers, custodial interrogation is permitted provided the police observe certain rules intended to safeguard the suspect's constitutional rights. Before questioning, police must warn a suspect that he has a right to remain silent and that any statement he makes may be used against him. The suspect must also be told that he has the right to have an attorney present during interrogation and that an attorney will be provided if the suspect cannot afford to hire one. The suspect has no duty to answer questions. If "the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." *Miranda,* 384 U.S. at 445, 86 S.Ct. at 1612.

▪ A suspect may waive his fifth amendment rights if the waiver is made "voluntarily, knowingly and intelligently." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. When a suspect makes a statement following custodial interrogation in the absence of counsel, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and

his right to retained or appointed counsel," and a valid waiver "will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact obtained." *Id.* at 475, 86 S.Ct. at 1628.

In *Miranda,* the Court suggested that "[a]n express statement that the individual is willing to make a statement" may be required for a valid waiver. In *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979), the Court established a somewhat more flexible standard, holding that "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver" may support the conclusion that a defendant waived his rights despite the absence of an express oral or written waiver. The Court repeated, however, the *Miranda* Court's admonition that "mere silence is not enough" and reaffirmed that "[t]he courts must presume that a defendant did not waive his rights; the prosecution's burden is great." *Butler,* 441 U.S. at 373, 99 S.Ct. at 1757.

In the case at bar, the state failed to meet its burden of demonstrating that the petitioner voluntarily waived his right to remain silent. Conceding that the petitioner never waived his right to remain silent before he was interrogated, the state contends that the interrogation was nonetheless proper because the petitioner had not specifically invoked his rights. Implicit in the state's position is an assertion that by exercising his fifth amendment right to remain silent, the petitioner waived his fifth amendment right to be free from custodial interrogation. This argument turns *Miranda* on its head and must be rejected.

▪ Custodial interrogation is inherently coercive and is therefore presumptively improper. Law enforcement officials have no right to question a suspect in custody. On the contrary, suspects have a constitutional right *not* to be questioned. It is not the petitioner's burden to show that he asserted his right to be free from interrogation. Rather, it is the state's bur-

den to justify the custodial interrogation by demonstrating that the petitioner waived his right.

◼ The state misconstrues the nature of the petitioner's fifth amendment rights by seeking to separate the right not to provide evidence against oneself from the right not to be interrogated while in custody. The indissoluble link between the two is the dominant theme of *Miranda:* "The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated." *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630. Thus, a valid waiver of fifth amendment rights, either express or "clearly inferred from the actions and words of the person interrogated," *Butler,* 441 U.S. at 373, 99 S.Ct. at 1757, is a prerequisite to any custodial interrogation. *Miranda* admits of no misty region where interrogation is permitted in the absence of a waiver while the suspect decides whether to talk.

◼ The state's fifth amendment theory seriously falters when it is applied to the facts of the case. The state cannot use the petitioner's confession without demonstrating a waiver of fifth amendment rights. It need not, however, under its theory, show that the petitioner waived his rights before the interrogation began. With the exception of one isolated remark made long before he confessed, the petitioner exercised his right to remain silent throughout the 35 to 50 minute interrogation. "But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Miranda,* 384 U.S. at 475, 86 S.Ct. at 1628.

◼ The petitioner's single statement "I never went in the woods the next day" is constitutionally irrelevant because it was the product of an unconstitutional interrogation. Even if this were not the case, the remark would not be significant. That the petitioner once corrected an interrogator with regard to his own whereabouts hardly indicates a general willingness to talk about the murders. The petitioner's statement is not one from which a waiver of fifth amendment rights can be "clearly inferred," particularly in light of the petitioner's refusal to answer any other questions.

◼ The state suggests that Mr. Woods intentionally did not cut off questioning in the hope of learning about the state's case against him. Even if that were true, it would not be sufficient to constitute a waiver. A suspect is not compelled to communicate with the authorities, and if he chooses to stand absolutely mute, not even indicating to police whether he wishes to be questioned, he is within his fifth amendment rights. The police are not thereby licensed to grill the silent suspect. Custodial interrogation is forbidden unless the suspect by his actions or course of conduct waives his right to remain silent. Since the petitioner made no such waiver, his confession was obtained in violation of his fifth amendment rights.

◼ If we were to assume, arguendo, that the interrogation of the petitioner was somehow consistent with the formal requirements of *Miranda,* the confession would still be inadmissible. The fifth amendment requires the suppression of not only confessions elicited in violation of the safeguards established in *Miranda,* but also of confessions which were not voluntarily made in the "totality of circumstances." *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979). A confession is voluntary only if it is the result of a "free and rational choice," *Miranda,* 384 U.S. at 464, 86 S.Ct. at 1622, made "in the unfettered exercise of [the defendant's] free will," *Malloy,* 378 U.S. at 8, 84 S.Ct. at 1493, and not caused by improper influences "which the law treats as legally sufficient to engender in the mind of the accused hope or fear in respect to the crime charged." *Bram v. United States,* 168 U.S. 532, 549, 18 S.Ct. 183, 189, 42 L.Ed. 568 (1897). See also *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976).

In the case of a juvenile, the totality of circumstances includes "the juvenile's age, experience, education, background, and intelligence and ... whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare*, 442 U.S. at 725, 99 S.Ct. at 2572. When a juvenile confesses, courts must exercise "the greatest care" in assuring not only that the confession was not coerced "but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *In re Gault*, 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527 (1967). "Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda*, 384 U.S. at 476, 86 S.Ct. at 1629.

The petitioner, 16 years 9 months old at the time of the confession, had no previous experience with the criminal justice system. He was awakened by a police officer, handcuffed, and driven to police headquarters. He was fingerprinted and photographed. His clothes were taken, and he was forced to put on jail coveralls. He was left barefoot. Finally, the petitioner was placed in a room where he was confronted with gruesome photographs and interrogated by four detectives in two shifts.

During the petitioner's interrogation, the detectives pretended that the case against him was airtight. One detective showed the petitioner bogus evidence which he claimed would "pin down" or "hang" the petitioner. The "gentle" inducements, such as the advice that things would "be easier" or "go better" if the petitioner talked and the "fatherly" hand on the shoulder, may have added to the petitioner's confusion and magnified the ominous effect of the scare tactics.

I conclude from the totality of the circumstances that the petitioner was very likely terrified during his interrogation and that his confession was the product of fear induced by improper influences rather than a rational choice of the petitioner's free will. *See, State v. Woods*, 117 Wis.2d 701, 739, 345 N.W.2d 457 (1984) (Abrahamson, J., dissenting). This conclusion is supported by the interrogators' testimony that the petitioner was in an emotional state and that he cried just before making a statement.

The circumstances of the petitioner's arrest were highly intimidating, particularly to an adolescent. The police demonstrated their total domination of the petitioner by waking him in his own bed, leading him away over his grandmother's protestations, and taking his clothes, leaving him barefoot in a jail coverall. Even before beginning interrogation, police had undermined the petitioner's ability to exercise his free will.

The interrogation tactics used against the petitioner were highly improper. The interrogators' deceptions distorted the balance of factors relevant to the petitioner's decision whether to talk to police and so undermined his ability to make a rational choice. The interrogators overcame the petitioner's will by frightening him into confessing. Because the confession upon which the petitioner's conviction is based was obtained in violation of the petitioner's fifth amendment right not to incriminate himself, the petitioner's continued custody is unconstitutional.

Therefore, IT IS ORDERED that the writ of habeas corpus be issued unless trial is commenced within 90 days of the date of this order.