STATE of Wisconsin, Plaintiff-Appellant,

v.

Sheila L. McCOLLUM, Defendant-Respondent. [Case No. 90–0968–CR.]

STATE of Wisconsin, Plaintiff-Appellant,

v.

Michele E. DAVIS, Defendant-Respondent. [Case No. 90–0969–CR.]

STATE of Wisconsin, Plaintiff-Appellant,

v.

Sandra J. PETERSON, Defendant-Respondent. [Case No. 90–0970–CR.]

STATE of Wisconsin, Plaintiff-Appellant,

v.

Christine L. HILL, Defendant-Respondent. [Case No. 90–0971–CR.]

Court of Appeals

*Submitted on briefs October 3, 1990.—Decided November 14, 1990.*

(Also reported in 464 N.W.2d 44.)

184

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Richard White,* assistant district attorney.

On behalf of the defendant-respondent, Sheila L. McCollum, the cause was submitted on the brief of *Margaret A. Maroney,* assistant state public defender.

On behalf of the defendant-respondent, Michele Davis, the cause was submitted on the brief of *Robert W. McKinley* of *McKinley & Anderson* of Chippewa Falls.

On behalf of the defendant-respondent, Sandra J. Peterson, the cause was submitted on the brief of *Paul J. Lenz* of Altoona.

Before Cane, P.J., LaRocque and Myse, JJ.[1]

CANE, P.J. The state appeals an order dismissing charges of prostitution filed against Sheila McCollum, Michele Davis, Sandra Peterson and Christine Hill. All four women were charged with one count of prostitution, contrary to sec. 944.30(5), Stats.[2] The state contends

---

[1]Upon the chief judge's order dated November 2, 1990, this is issued as a three-judge opinion pursuant to sec. 809.41(3), Stats.

[2]Section 944.30 provides:

> Any person who intentionally does any of the following is guilty of a Class A misdemeanor:
>
> (1) Has or offers to have or requests to have nonmarital sexual intercourse for any thing of value.
>
> (2) Commits or offers to commit or requests to commit an act of sexual gratification, in public or in private, involving the sex organ of one person and the mouth or anus of another for any thing of value.
>
> (3) Is an inmate of a place of prostitution.
>
> (4) Masturbates a person or offers to masturbate a person or requests to be masturbated by a person for any thing of value.

that the trial court erred by ruling that the women were selectively prosecuted in violation of the fourteenth amendment's equal protection clause.[3] We reject the state's claim and affirm the trial court's dismissal of the charges.

On October 7, 1989, McCollum, Davis and Hill, all residents of Minnesota, formed part of a group of five performers at a club in Eau Claire County. The group was called "Sexy and Sweet." Peterson, a Wisconsin resident, acted as announcer for the performance and allegedly also performed nude during the evening.[4]

Sergeant Terry Biddle of the Eau Claire County Sheriff's Department received information that a private party was to be held at the club on October 7 and purchased four tickets to the party. Detectives Donald Hurrle and Thomas Maki of the Milwaukee County Sheriff's Department, and Investigators Dave Hake and Paul Burch of the St. Croix County Sheriff's Department used the tickets to gain admission to the club on October 7. Biddle and another Eau Claire County officer remained in the back of a truck in the club's parking lot during the performance.

---

(5) Commits or offers to commit or requests to commit an act of sexual contact for any thing of value.

[3]Article XIV of the United States Constitution provides, in pertinent part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." .

[4]While complaints filed against McCollum, Davis and Hill allege that they received money while engaging in various forms of sexual contact, the complaint against Peterson does not make this allegation. The absence of testimony that Peterson actually received money during her performance presumably explains why the charge against Peterson is denominated "Prostitution (PTAC)" in the state's complaint.

Inside the club, the four officers observed various forms of sexual contact occurring between all but one of the women performing and a number of the male patrons. Hurrle testified at the motion hearing that of the 100 male patrons in the bar, approximately fifty to seventy-five fondled the women performers and thrust money at them. He testified that he could not give a detailed description of any of the male patrons who had sexual contact, beyond describing them as "white males, somewhere in the area of maybe 20 to 35 years of age." Maki similarly testified at the motion hearing that he was unable to identify any male patron.

Biddle had requested backup assistance to arrive at the party's scheduled closing of 1 a.m., but the performance ended twenty minutes earlier than expected, and the majority of patrons had left the scene by the time the backup officers arrived. Maki testified that at the time the six officers on the scene arrested the women, there were still "perhaps several dozen" male patrons in the vicinity. Maki stated that he did not make an effort to arrest any of the male patrons. Both Hurrle and Maki testified that they understood the focus of the investigation to be on the female dancers. The four women were arrested while trying to leave the club. The male owner of the club was also arrested and prosecuted, but on a different charge. No male patron who engaged in sexual contact with the women was arrested.

## PURPOSEFUL DISCRIMINATION AND THE STANDARD OF REVIEW

The trial court found:

> Once the party broke up, partly due to the fact that these people were shorthanded, only the performers were arrested. But, again, the officers man-

aged to arrest all of the women performers and no men whatsoever. It's difficult to believe that the one-sidedness of the arrests for all women and no men were [sic] totally due to the fact of being short-handed. It certainly had to be in large measure because of the focus of the investigation—namely, the performers, i.e., women.

It seems to me that the only conclusion that can be reached then is that the purpose of this investigation was to arrest these performers because of and not in spite of the fact that they were the women who were performing.

The state contends that our review of the trial court's ruling that there was intent to discriminate on the basis of sex should be de novo, citing *State v. Woods,* 117 Wis. 2d 701, 715–16, 345 N.W.2d 457, 468 (1984), *habeas corpus granted sub nom. Woods v. Clusen,* 605 F. Supp. 890 (E.D. Wis. 1985), *aff'd,* 794 F.2d 293 (7th Cir. 1986) (a determination whether an accused knowingly, intelligently and voluntarily waived his rights is a matter of constitutional fact that is independently reviewed by an appellate court).

Constitutional facts depend on findings of historical facts by the trial court, which are reviewed under the clearly erroneous standard. *See* sec. 805.17(2), Stats. Peterson argues in her brief that a number of the trial court's findings were historical facts, entitled to review under the clearly erroneous standard.[5]

---

[5]These findings are: (1) that only the women were arrested for illegal sexual behavior, while the male patrons were not, and (2) that the women performers were the target or focus of the investigation.

The line between historical fact and constitutional fact is "often fuzzy at best." *Container Corp. v. Franchise Tax Bd.*, 463 U.S. 159, 176 (1983). In the arena of purposeful discrimination violative of the equal protection clause, however, the United States Supreme Court has provided clear guidance. Where the trial court applied the correct legal standard in its inquiry, *Rogers v. Lodge,* 458 U.S. 613, 620-22 (1982), the issue of whether a particular legislative scheme is being maintained for discriminatory purposes is a finding that should be reviewed under the clearly erroneous standard. *Id.* at 623; *see also Pullman-Standard v. Swint,* 456 U.S. 273, 287-88 (1982) (whether the differential impact of a seniority system resulted from an intent to discriminate on racial grounds is a pure question of fact, to be reviewed under the clearly erroneous standard). As the *Swint* Court noted, issues of intent are commonly treated as factual matters. *Id.* at 288. The *Rogers* Court stated that deciding whether a discriminatory purpose exists demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. *Id.* at 618 (citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265 (1977)).

Our de novo review, then, is limited to determining whether the trial court applied the correct legal standard to determine that there was purposeful discrimination. If it did, we review its finding under the clearly erroneous standard as to whether the state's action in investigating, arresting and charging the women was motivated by an intent to discriminate on the basis of sex.

## THE TRIAL COURT APPLIED THE CORRECT LEGAL STANDARDS

The trial court did not apply the standard established by our supreme court in *State v. Johnson,* 74 Wis. 2d 169, 246 N.W.2d 503 (1976). The *Johnson* court held:

> There may be valid prosecutorial reasons for prosecuting a prostitute and not the patron under given circumstances such as organized commercial prostitution, immunity from prosecution to testify, and others. Nor can one or few isolated incidents of failure to prosecute both be sufficient grounds to escape prosecution for a criminal act upon equal protection grounds. To avoid prosecution for a criminal offense upon equal protection grounds it must be shown that the failure to prosecute was *selective, persistent, discriminatory and without justifiable prosecutorial discretion.*

*Id.* at 174, 246 N.W.2d at 507 (emphasis added). Here, the trial court stated:

> First of all, let me say that I don't have any problem in concluding that the defense has not shown a prima facie case of any kind of a pattern to the extent that might be required by the *State v. Johnson* case. But I'm also satisfied that the United [sic] Supreme Court cases don't make the proof of a pattern the exclusive method of showing violation of equal protection. An equal protection violation can be shown, first, by proving that the prosecution has a discriminatory effect and, second, by proving that it's motivated by a discriminatory purpose.

The trial court applied the "discriminatory effect/discriminatory purpose" standard articulated in *Wayte v. United States,* 470 U.S. 598, 608 (1985) ("It is appropriate to judge selective prosecution claims according to ordinary equal protection standards . . . [that] require

petitioner to show both that the passive enforcement system had a discriminatory effect and that it was motivated by a discriminatory purpose."). We note that the *Johnson* standard was developed nine years before *Wayte*. Additionally, a claim under the United States Constitution is to be determined using the test set forth by the United States Supreme Court. *State v. Pitsch,* 124 Wis. 2d 628, 641, 369 N.W.2d 711, 718 (1985).[6]

■ The trial court also applied the correct standard to determine whether the state's actions had a discriminatory effect. The court found that "[w]hat we're talking about here is people who are similarly situated. Men and women were involved in these alleged acts. Only the women were arrested, not the men." The "similarly situated" standard to determine the existence of discriminatory effect was recently discussed in *United States v. Aguilar,* 883 F.2d 662 (9th Cir. 1989). *Aguilar* involved a claim that defendants were singled out for prosecution because of their vocal opposition to United States foreign policy in Central America and to the United States' refugee and asylum policy. This equal protection claim,

---

[6]We recognize that a court of appeals decision overruling a controlling decision of the supreme court is patently erroneous and usurpative. *State v. Grawien,* 123 Wis. 2d 428, 432, 367 N.W.2d 816, 818 (Ct. App. 1985). Our holding here, however, does not overrule *Johnson.* While *Johnson* addressed a claim of selective prosecution based on gender, it was decided in November, 1976, one month before the United States Supreme Court recognized gender as a suspect classification for purposes of equal protection analysis in *Craig v. Boren,* 429 U.S. 190 (1976). The *Wayte* Court developed its "discriminatory effect/discriminatory purpose" standard for use in determining selective prosecution claims involving suspect classifications. *Id.* at 608. *Johnson* remains the standard by which claims of selective prosecution not based on membership in a suspect group will be judged.

based on the exercise of first amendment rights, involves (as does the present case) selective prosecution of a suspect classification, to which courts will apply a heightened level of scrutiny. The *Aguilar* court stated:

> Appellants must demonstrate as a prerequisite to an evidentiary hearing that similarly situated persons "are generally not prosecuted for the same conduct." *United States v. Wilson,* 639 F.2d 500, 503 (9th Cir. 1981). This first prong of the selective prosecution prima facie showing insures that the government has at least conducted selective prosecutions; if similarly situated persons are being prosecuted then appellants fail to make the required showing.
>
> . . ..
> The goal of identifying a similarly situated class of law breakers is to isolate the factor allegedly subject to impermissible discrimination. The similarly situated group is the control group. The control group and defendant are the same in all relevant respects, except that defendant was, for instance, exercising his first amendment rights. If all other things are equal, the prosecution of only those persons exercising their constitutional rights gives rise to an inference of discrimination. But where the comparison group has less in common with the defendant, then factors other than the protected expression may very well play a part in the prosecution.
>
> . . ..
> Our task is to identify an appropriate control group. Absent a similarly situated control group, the government's prosecution of a defendant exercising his constitutional rights proves nothing.

*Id.* at 706.

The state concedes that we must apply the "similarly situated" standard to determine whether selective prosecution had a discriminatory effect. The concession

197

is appropriate. Wisconsin case law on selective prosecution claims supports the use of a "similarly situated" standard to determine discriminatory effect. *See, e.g., Johnson,* 74 Wis. 2d at 173, 246 N.W.2d at 506 ("A basic consideration to the question of equal protection in the enforcement of laws is that 'all persons similarly circumstanced shall be treated alike,' " (quoting *Reed v. Reed,* 404 U.S. 71, 76 (1971)).

The trial court also applied the correct standard when determining whether there was a discriminatory purpose. The court's ruling that "the purpose of this investigation was to arrest these performers because of and not in spite of the fact that they were the women who were performing," addressed itself to the standard established in *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279 (1979): " 'Discriminatory purpose' . . . implies more than . . . intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group." (Citation omitted.) Having concluded that the trial court applied the correct legal standards in its determination, we now examine its findings to determine if they are supported by the record.

## THE TRIAL COURT'S FINDINGS ARE NOT CLEARLY ERRONEOUS

With respect to the issue of discriminatory effect, the state contends that patrons were not similarly situated with the women performers, for two reasons: (1) the women engaged in a larger number of criminal law violations than the men; and (2) the women received finan-

cial benefit from their actions. We reject both of these contentions.

As a threshold issue, we address the question of which statutory section the alleged actions of the unprosecuted male patrons violated. While we do not hold that conduct by two groups must necessarily violate the identical statutory section in order to maintain a selective prosecution claim, in this case both the male patrons and women performers could have been charged under the same statutory section.

Statutory construction is a matter of law that we review independently of the trial court. *Town of Sheboygan v. City of Sheboygan*, 150 Wis. 2d 210, 212, 441 N.W.2d 752, 753 (Ct. App. 1989). In construing a statute, the primary source is the language of the statute itself. *Id.* at 213, 441 N.W.2d at 753. Where statutory language is unambiguous, we are guided by the plain meaning of the statute. *In re F.E.W.*, 143 Wis. 2d 856, 860, 422 N.W.2d 893, 895 (Ct. App. 1988). Section 944.30, Stats., is plain and unambiguous.

The text of sec. 944.30, Stats., is as follows:

Any person who intentionally does any of the following is guilty of a Class A misdemeanor:

(1) Has or offers to have or *requests to have* nonmarital sexual intercourse for any thing of value.

(2) Commits or offers to commit or *requests to commit* an act of sexual gratification, in public or in private, involving the sex organ of one person and the mouth or anus of another for any thing of value.

(3) Is an inmate of a place of prostitution.

(4) Masturbates a person or offers to masturbate a person or *requests to be masturbated* by a person for any thing of value.

(5) Commits or offers to commit or *requests to commit* an act of sexual contact for any thing of value. (Emphasis added.)

It is a cardinal rule of construction that no part of a statute should be rendered superfluous by interpretation. *State v. Ozaukee Co. Bd. of Adj.*, 152 Wis. 2d 552, 559, 449 N.W.2d 47, 50 (Ct. App. 1989). To interpret the underlined statutory language to apply only to the payee in a prostitution transaction would make the preceding clauses prohibiting the action of *offering to* perform sexual acts mere surplusage. The plain language of sec. 944.30 makes criminal various acts of sexual gratification between two parties "for any thing of value," regardless of whether the party involved is payor or payee. Thus, the conduct of both the female performers and the male patrons violated sec. 944.30.

Next, we address each of the state's claims that the women and the male patrons were not "similarly situated." First, the state argues that "assuming that each incident of sexual contact and exchange of money constituted a criminal offense, there can be little question that the defendants engaged in far more criminal law violations than each male patron." The women, however, were charged with only *one* violation each. The record does not support an inference that the observing officers were counting the violations by either party during sexual contact. An individual male patron would conceivably have violated the statute as many times as an individual female performer. The trial court's finding, therefore, was not clearly erroneous.

Second, the state attempts to differentiate the two groups on the basis of the financial benefit received by the women performing. Male patrons were allegedly

thrusting bills of various denominations at the performers prior to sexual contact. This fact alone does not make the groups dissimilar for the purposes of violation of the prostitution statute. The Wisconsin Supreme Court clearly addressed this question in *Johnson:*

> While an argument can be made that a prostitute and the patron are not similarly circumstanced because of the commercial aspects, we do not believe that fact standing alone can be controlling. *The principal fact is that both parties have violated a sexual morality statute.*

*Id.* at 173, 246 N.W.2d at 506 (emphasis added). We conclude that the trial court did not err by finding that the male patrons and the women performers were "similarly situated," and thus the state's program of enforcement had a discriminatory effect.

With respect to the issue of discriminatory purpose, the record supports the trial court's conclusions. According to Biddle's report, when briefing the four officers from Milwaukee and St. Croix Counties prior to the commencement of the cooperative investigation, he advised them that "[t]he purpose of the investigation was to ascertain whether of [sic] not there was sexual activity within the establishment *which would warrant the arresting of individuals who were performing.*" (Emphasis added.)

Biddle was later deposed on March 23, prior to the motion hearing on April 2. He denied that the focus of the operation was on the performers and testified that "[t]he overall investigation was for the entire operation, whoever, you know, whether it be the dancer or the patrons." Biddle further testified that he had followed up and questioned some male patrons who had written checks at the club on the night of the performance, and

201

that he had filed written reports based on those interviews. The state never introduced those written reports on patron interviews at the subsequent motion hearing.

The trial court could reasonably conclude, however, that the officer's report, written when the issue of selective prosecution was not firmly before him, more accurately reflected the purpose of the investigation than his later deposition testimony. In addition, the testimony of both Hurrle and Maki supports an inference that the focus of the investigation was, from the outset, on the female performers. The trial court's finding that the state's actions were motivated by a discriminatory purpose was not clearly erroneous.

## VIOLATION OF EQUAL PROTECTION CLAUSE

Purposeful discrimination based on a suspect classification does not alone establish a violation of the equal protection clause. *See Korematsu v. United States,* 323 U.S. 214 (1944).[7] When faced with a claim of an equal protection violation based on impermissible gender discrimination, courts must apply an intermediate level of scrutiny to the classification system at issue. Our inquiry is directed to determining whether the challenged classification system is *substantially related to important governmental objectives. See Craig,* 429 U.S. at 197.

---

[7]The *Korematsu* Court stated:

> It should be noted, to begin with, that all legal restrictions which curtail the civil rights of a single racial group are immediately suspect. That is not to say that all such restrictions are unconstitutional. It is to say that courts must subject them to the most rigid scrutiny. Pressing public necessity may sometimes justify the existence of such restrictions; racial antagonism never can.

*Id.* at 216.

The state contends that two important governmental objectives were served by a policy of arresting only the women: (1) the women represented the smallest, most manageable group of violators and thus it was reasonable to use limited police resources to arrest only that group; and (2) the prosecution of the women would result in maximum deterrence. We address each claim of governmental interest in turn.

First, the state points to a decision where the Georgia Supreme Court upheld the arrest of only a portion of some 200 people involved in a demonstration because the arrestees represented the smallest, most manageable group of violators, which made it reasonable to use limited police resources to arrest only that group. *Sabel v. State,* 300 S.E.2d 663 (Ga. 1983), *overruled on other grounds, Massey v. Meadows,* 321 S.E.2d 703, 704 (Ga. 1984). Also, the state urges that it was faced with "proof problems" in any case against a male patron, because the officers involved in the investigation could not identify any of the male patrons. It further argues that because one-half to one-fourth of the male patrons in the establishment did not have any sexual contact, and it would be difficult to differentiate these "innocent" patrons from others outside the tavern in the dark, it made sense to arrest only the women.

We reject these arguments and note that the reason the officers could not identify any of the male patrons, according to their own testimony, was because they understood the focus of the investigation to be on the female dancers. The state cannot legitimately discriminate against two groups of violators in the investigation phase, and then argue that they should be allowed to arrest only one because they did not have sufficient proof to arrest the other.

We further note that *Sabel* is factually distinguishable from the case before us. In *Sabel*, a small group of Communist party members who were demonstrating at an apartment complex attempted to gain entry to a tenant's apartment and prevented the tenant from closing her front door to shut them out. They were surrounded by a large group of angry tenants who were openly hostile to the Communist party members. In such a case, the *Sabel* court ruled, there is no selective prosecution when the police act to arrest the smaller group to prevent a riot. *Id.* at 665. No such emergency situation confronted the police in this case.

Neither does the existence of some innocent male patrons among the crowd outside the tavern justify the discriminatory treatment. There was also one innocent female performer, who was not arrested or charged. Had the observing officers attempted to identify the male offenders, they could have used that information to select between those males who violated the statute and those who did not.

Second, the state argues that the prosecution of the women would result in maximum deterrence. It cites a decision where the North Carolina Court of Appeals held that the state could legitimately focus its attention on the providers of illegal sexual services because prosecutions of those individuals would provide the greatest public benefit. *State v. Evans,* 326 S.E.2d 303 (N.C. Ct. App. 1985). *Evans* involved a North Carolina statute different from ours, under which the customers of a prostitute could not be seen to be "loitering for the purposes of prostitution." *Id.* at 307. The *Evans* court stated that "*it is well within the power of the legislature to punish the prostitute and provider of sexual services and not the customer.*" *Id.* (emphasis added).

While this differential punishment may be within the power of the legislature, it is precisely what the Wisconsin legislature did not choose to do in adopting sec. 944.30, Stats. As we previously indicated, the plain language of that statute criminalized the behavior of both the payor and the payee involved in a prostitution arrangement. Further, it is persuasive that the goals of both general and specific deterrence in this case would have been better served by the arrest of some of the large number of local citizens involved in illicit behavior than by the arrest of a small number of out-of-towners.

Here, the police intentionally focused their investigation on, and made their arrests of, only the female violators of sec. 944.30, Stats. There is no important governmental objective substantially related to this enforcement scheme. As such, the state selectively prosecuted the four women in violation of the equal protection clause, and therefore the trial court properly dismissed the charges.

*By the Court.*—Order affirmed.