State of Wisconsin, Plaintiff-Appellant,
v.
Bruce A. Halmstad, Defendant-Respondent.
No. 04-1317-CR.
Court of Appeals of Wisconsin.
Opinion Filed: February 15, 2005.
Before Cane, C.J., Hoover, P.J., and Peterson, J.
¶ 1 CANE, C.J.
The State appeals from a judgment and an order dismissing criminal charges against Bruce A. Halmstad on the grounds the prosecution was "vindictive, retaliatory and selective." The State argues that the trial court erred because it did not apply any legal standard in its decision to dismiss. If it had applied the proper standard, the State contends, it would have found that Halmstad did not meet his prima facie burden of establishing the prosecution had both a discriminatory effect and a discriminatory propose. The State argues, alternatively, that even if Halmstad met that prima facie burden, the charging decision reflects a valid exercise of prosecutorial discretion. Because we conclude there is no evidence Halmstad was singled out for prosecution while others, similarly situated, were not, we agree he did not meet his prima facie burden. We therefore reverse the judgment and order, direct reinstatement of the charges, and remand to the trial court for further proceedings.

Background
¶ 2 On September 2, 2002, a tornado struck the town of Ladysmith in Rusk County. On September 3, a Wisconsin Emergency Management team arrived in the area to assess the damage and begin the process of declaring a state of emergency. That same day, the chair of the county board, Randy Tatur, sent a letter to "all department heads and elected officials" authorizing overtime pay for "hourly, salaried, and elected officials" until further notice.[1] After the governor declared a state of emergency, Federal Emergency Management Agency (FEMA) workers moved in to assist relief efforts in a variety of ways, including establishing a federal reimbursement program. Under that program, the federal government would reimburse local governments for seventy-five percent of disaster damages if the state and the affected municipalities each provided a twelve and one-half percent funding "match."[2] Municipalities are permitted to meet that requirement by substituting volunteer labor hours for money after establishing an average wage or rate of pay based on local standards for the volunteer hours. In Rusk County, it was determined that, for the purposes of the matching requirement, each volunteer labor hour was to be valued at $14.05.
¶ 3 At the time of the tornado, Halmstad was a county board supervisor and chair of the board finance committee. Like other local officials, he helped clean up after the disaster. Sometime after September 15, Halmstad told a deputy payroll clerk trainee, Lisa Podgornak, that he and two other board supervisors, Julie Meisegeier and Randy Tatur, were to be paid the approved rate of $14.05 per hour for tornado-related work.[3] Halmstad submitted disaster relief time sheets, claiming 469 hours worked between September 2, 2002, and October 20, 2002. He received a check for $4,883.61 for that work on October 24 and cashed the check the next day. Meisegeier and Tatur were also issued checks. Meisegeier cashed her check for $670.19, but then immediately donated the gross amount of the check, $765.73,[4] to the county; Tatur simply returned his voided check to the county. There is no evidence that Tatur or Meisegeier consulted anyone before taking these actions or that anyone contacted them about being paid for tornado relief efforts.
¶ 4 On November 19, a citizen, William Volkman, complained to the sheriff's department that Halmstad had been paid money he was not entitled to for tornado clean-up. An investigation followed and, on February 25, 2003, the district attorney charged Halmstad with one count of felony theft, under WIS. STAT. § 943.20(1)(a), and one count of misconduct in office, under WIS. STAT. § 946.12(2). After a preliminary hearing on May 8, 2003, the circuit court found probable cause to believe Halmstad had committed a crime, binding him over for trial on both counts. In December, Halmstad filed two motions to dismiss. The first motion contended the sheriff's department had vindictively investigated him because he had, as chair of the finance committee, reduced the department budget. In the second motion, Halmstad claimed his prosecution was selective and discriminatory because, of the three board supervisors who received disaster pay, he alone was criminally charged. After an evidentiary hearing on March 6, 2004, the circuit court dismissed the charges against Halmstad, concluding that the prosecution was selective. The State now appeals.

Discussion
¶ 5 District attorneys in Wisconsin have great discretion in deciding whether to initiate prosecution in particular cases. See Sears v. State, 94 Wis. 2d 128, 133, 287 N.W.2d 785 (1980).
There is no obligation or duty upon a district attorney to prosecute all complaints that may be filed with him. ... [A] great portion of the power of the state has been placed in his hands to use in the furtherance of justice, and this does not per se require prosecution in all cases where there appears to be a violation of the law ....
State ex rel. Kurkierewicz v. Cannon, 42 Wis. 2d 368, 378, 166 N.W.2d 255 (1969). The exercise of prosecutorial discretion "necessarily involves a degree of selectivity." Sears, 94 Wis. 2d at 134. Thus, the fact that a prosecutor may consciously choose to enforce or not enforce a law does not, by itself, create a constitutional violation. See id.
¶ 6 A selective prosecution claim is not a defense on the merits to a criminal charge. Rather it is an independent claim that the charge or charges have been brought for constitutionally forbidden reasons. See, e,g., United States v. Armstrong, 517 U.S. 456, 463 (1996). In order to have the right to an evidentiary hearing on a selective prosecution claim, a defendant must meet the initial burden of establishing a prima facie showing of discriminatory or selective prosecution. State v. Nowakowski, 67 Wis. 2d 545, 565-67, 227 N.W.2d 697 (1975) (applying United States v. Falk, 479 F.2d 616, 620-23 (7th Cir. 1973)).
¶ 7 To establish a prima facie case of selective prosecution, a defendant must present evidence the prosecution had both a discriminatory purpose and a discriminatory intent. State v. Kramer, 2001 WI 132, ¶ 18, 248 Wis. 2d 1009, 637 N.W.2d 35. The first prong is satisfied if the defendant can show he or she was singled out for prosecution while others similarly situated were not. Id. A solitary prosecution can meet the discriminatory purpose requirement if the defendant makes a "substantial showing" the prosecution is based on "a desire to prevent the exercise of constitutional rights or motivated by personal vindictiveness on the part of a prosecutor or the responsible member of the administrative agency recommending prosecution." Sears, 94 Wis. 2d at 134-35 (citation omitted). The second prong, discriminatory intent, requires a showing that the choice to prosecute was based on an impermissible consideration such as race, religion, or other arbitrary classification. Kramer, 248 Wis. 2d 1009, ¶ 18.
¶ 8 Because a trial court's decision as to whether a defendant has established a prima facie case of selective prosecution involves an essentially factual inquiry, we will uphold that decision if it is supported by credible evidence or reasonable inferences that can be drawn from the evidence. Id., ¶ 17. Whether the court applied the correct legal standard in the decision is, however, a question of law, which we review without deference. State v. McCollum, 159 Wis. 2d 184, 194, 464 N.W.2d 44 (Ct. App. 1990).
¶ 9 Halmstad argues he was singled out for prosecution in the same way North Fond du Lac tavern owners were in Kramer because (1) Tatur's letter authorizing overtime pay for "hourly, salaried, and elected officials" made it reasonable for him to submit tornado work hours for pay; (2) the Attorney General's opinion that overtime payments to the sheriff and other elected officials were not authorized, but did not require repayment, legitimized his payment; and (3) his actions as a fiscal conservative committed to lowering the county budget motivated the sheriff's office to pursue him rather than Tatur or Meisegeier, the other board supervisors paid for post-tornado relief work. But Halmstad's dependence on Kramer is misplaced, and his analysis relates to facts that might be relevant to guilt or innocence at trial, rather than to facts that would establish others similarly situated were not prosecuted.
¶ 10 In Kramer, the sheriff and district attorney notified tavern owners in Fond du Lac by letter that, in a change in policy, complaints about payouts on video poker machines would be investigated and prosecuted. Kramer, 248 Wis. 2d 1009, ¶ 5. This letter was not sent to Kramer or anyone who owned a tavern in the village of North Fond du Lac. Id. After an undercover investigation, Kramer and several other North Fond du Lac tavern owners were charged with crimes relating to commercial gambling. Id., ¶ 7. The fact that letter was sent to some tavern owners and not others showed discriminatory purpose because it indicated that prosecutorial decisions were based on an arbitrary consideration: geography. Id., ¶ 19. Kramer's prima facie showing of discriminatory effect was based on evidence that a Fond du Lac tavern owner who admitted to paying video poker winners was not prosecuted. Indeed, despite the fact that all tavern owners with such machines were "similarly situated" with regard to potential prosecution, only North Fond du Lac taverns were actually targeted for prosecution. Id., ¶¶ 21, 23.
¶ 11 Although much of Halmstad's argument focuses on his justifications for taking money for tornado related work, he does assert that he, Tatur, and Meisegeier, were similarly situated in three ways. They were all board supervisors. They all filled out volunteer tornado work time sheets. They all received checks from the county. Those factors do not, however, establish that Halmstad, Tatur, and Meisegeier were similarly situated with respect to prosecution for theft or misconduct in office because the factors do nothing to demonstrate similar conduct.
¶ 12 All three received checks from the county; but, as a matter of undisputed fact, only Halmstad cashed his check and kept the money while the other two supervisors immediately returned the money to the county. Under WIS. STAT. § 943.20, theft requires taking the property of another without the owner's consent; it also requires knowledge of the owner's lack of consent and the intention to permanently deprive the owner of that property. The three supervisors were thus not similarly situated with regard to potential prosecution because there was no evidence Tatur or Meisengeier intended to deprive the county of money.
¶ 13 All three filled out tornado work time sheets, but that conduct is not necessarily similar for the purposes of the prosecution. To satisfy the FEMA reimbursement plan requirements, hundreds of people filled out tornado work time sheets. Some did so because they were entitled to overtime pay for those hours. Some did so only to document volunteer hours that could be "weighed" at $14.05 for the purposes of meeting the county's "match requirements." And, according to the district attorney, one, Halmstad, filled out time sheets in order to commit theft. There was evidence Halmstad told the payroll clerk that FEMA agreed that he and the other board supervisors were to be paid for their volunteer hours. There was also evidence Halmstad asked a Wisconsin Emergency Management employee "four or five times" how he could get paid for clean-up. Other statements, including his own, indicated Halmstad knew Tatur's letter authorizing overtime pay did not apply to board supervisors. By contrast, there is no evidence that Tatur or Meisengeier asked about getting paid, spoke to anyone in payroll, or did anything from which to infer they filled out their time sheets for any reason but to log volunteer hours. The only evidence of their intentions in filling out the sheets is their responses when they received their checks. Both supervisors immediately returned the money. This is not evidence of a similar course of conduct.
¶ 14 There is no thus no evidence that would support the claim the three board supervisors were similarly situated in relation to prosecution for theft. For almost precisely the same reasons, Halmstad, Tatur, and Meisengeier were not similarly situated with regard to prosecution for misconduct in office. Under WIS. STAT. § 946.12, misconduct occurs when a public officer, acting in an official capacity, knowingly engages in conduct in excess of that officer's lawful authority. The similarly situated analysis thus turns on whether a factual case could be made that all three supervisors knowingly acted in excess of their authority. Filling out volunteer time sheets would not be in excess of a board supervisor's lawful authority unless evidence indicated the supervisor intended to receive money for the hours logged. As we have already said, some evidence suggests Halmstad had that intention. Nothing in the record indicates that Tatur and Meisegeier did.
¶ 15 Because we conclude that Halmstad did not meet his prima facie burden of demonstrating discriminatory effect by showing that others were "similarly situated" with respect to prosecution, we need not address the second prong of selective prosecution, discriminatory purpose. We therefore reverse the trial court's judgment and order, direct that the charges against Halmstad be reinstated, and remand for further proceedings.
By the Court.  Judgment and order reversed and cause remanded with directions.
NOTES
[1] Tatur could not authorize overtime pay for any board supervisor. Supervisors are paid per diem for each day they attend board meetings; the board decides the level of that compensation, but not its form. WIS. STAT. § 51.10(3)(f). Committee members are similarly paid per diem to attend committee meetings. WIS. STAT. § 59.13(2).

All references to the Wisconsin Statutes are to the 2003-04 version unless otherwise noted.
[2] In emergency situations, matching is critical because FEMA does not disburse any funds until the requirement is met.
[3] After her conversation with Halmstad, Podgornak apparently recorded those three names, and the name of a fourth person of no concern here because he was not a county board supervisor, and the amount to be paid on a Post-It note. She also wrote the following sentence: "This amount was agreed on w/ FEMA based on weighted average per Bruce H."
[4] That sum represents the amount of her check before taxes and other deductions.