COUNTY OF KENOSHA, Plaintiff-Respondent,

v.

C & S MANAGEMENT, INC., d/b/a Crossroads, Defendant-Appellant.

Supreme Court

*No. 97–0642. Oral argument September 10, 1998.—Decided January 22, 1999.*

(Also reported in 588 N.W.2d 236.)

374

For the defendant-appellant there were briefs (in the court of appeals) by *Stephen M. Glynn, Robert R. Henak* and *Shellow, Shellow & Glynn, S.C.*, Milwaukee and oral argument by *Robert R. Henak*.

For the plaintiff-respondent there was a brief (in the court of appeals) by *Angelina Gabriele,* assistant district attorney and oral argument by *Susan L. Karaskiewicz*, assistant district attorney.

¶ 1. DONALD W. STEINMETZ, J. This case raises a number of issues for review:

(1) Does Wis. Stat. § 944.21, prohibiting the sale of obscene material, violate the federal and Wisconsin Constitutions in being too vague and overbroad? We hold that it does not.

(2) If the Wisconsin standard of obscenity is that stated in *Miller v. California*, 413 U.S. 15 (1973), were jury instructions which expanded the *Miller* "prurient interest" standard to material that "appeals generally to a shameful, *unhealthy, unwholesome, degrading*. . .interest in sex" and added the word *genuinely* to the *Miller* "serious value" definition erroneous? (Emphasis added.) We hold that they were not.

(3) What motion allegations sufficiently support a *prima facie* showing that a hearing is required to resolve issues of impermissible discrimination based on selective prosecution in constitutionally sensitive prosecutions? We hold that a *prima facie* showing requires a defendant to provide evidence of a discriminatory effect and a discriminatory purpose to defendant's prosecution.

(4) Whether the circuit court erred in excluding a survey, expert testimony, and allegedly comparable videotapes available in Kenosha County as evidence of prevailing community standards with respect to obscenity. We hold that the circuit court did not erroneously exercise its discretion.

¶ 2. This case is before the court on certification from the court of appeals, pursuant to Wis. Stat. § (Rule) 809.61 (1995–96). Defendant-appellant appeals decisions by the Honorable Bruce E. Schroeder, Kenosha County Circuit Court.

I

¶ 3. The relevant facts in this appeal are not disputed by the parties. C & S Management, Inc., operates Crossroads News Agency (Crossroads), an adult bookstore in Kenosha County located along Interstate Highway I–94. It was charged in four cases with a violation of Kenosha County, Wis., Municipal Code § 9.10.2[1] [hereinafter "Kenosha County Ord. § 9.10.2"] for selling videotapes alleged by the county to be obscene.[2]

¶ 4. Crossroads filed two related motions seeking dismissal of the case on the grounds that Kenosha

_____

[1] As the court of appeals noted in its certification of the issue to this court, the Kenosha ordinance which is the subject of this appeal is identical to Wis. Stats. § 944.21, in all respects except that penalty provisions vary and prosecution under the statute requires the approval of the attorney general while prosecuting under the ordinance does not. The parties to this appeal, explicitly or by implication, have noted that the constitutional challenge applies equally to both the Kenosha ordinance and § 944.21. We will refer only to the statute because affirming either affirms the other. From time to time as necessary, we do refer to the ordinance. Our discussion of either necessarily implicates the other.

[2] Two other adult-oriented bookstores located along Highway I–94 were also each charged in four cases with the violation of Kenosha County Ord. § 9.10.2. These two other bookstores joined Crossroads in a number of its motions. While these other bookstores are referred to from time to time, they are not parties to this appeal.

County had engaged in selective and discriminatory prosecution. In its first motion, Crossroads argued that the county had impermissibly singled out for prosecution Crossroads and two other adult-oriented bookstores for the non-obscene sexually explicit nature of their inventories and their locations along Interstate 94, while at the same time allowing other businesses in the community to sell materials virtually identical to those videos for which they were being prosecuted. In a second motion, Crossroads argued that the express purpose of the prosecutions was not to prosecute obscenity but to close down completely all of the adult bookstores in the county.

¶ 5.   At a hearing on the motions, the circuit court denied Crossroads' motions without providing Crossroads with an evidentiary hearing. The district attorney asked the circuit court to accept as true all of the allegations contained in Crossroads' motions, and in doing so the circuit court found that Crossroads had failed to make a *prima facie* showing of discriminatory prosecution and denied its motions to dismiss the charges against Crossroads without holding an evidentiary hearing. Crossroads petitioned for leave to appeal the circuit court's denial of its motions, which the court of appeals denied.

¶ 6.   Three of the four cases against Crossroads were dismissed on summary judgment. A fourth case, involving Crossroads' sale of the videotape entitled "Anal Vision No. 5," proceeded to a jury trial which began January 27 and ended January 29, 1997. At the trial, Crossroads stipulated to the fact that the videotape was sold for commercial purposes and that it knew the tape was sexually explicit. The only contested issue was whether the tape was "obscene" under Kenosha County Ord. § 9.10.2.

¶ 7.　The jury returned a non-unanimous verdict of guilty and the court imposed a $4,000 fine and costs of the trial. Crossroads appealed the verdict on numerous grounds, including the four issues stated. The court of appeals certified the first three to this court. As the parties fully briefed the certified issues, as well as the question of whether the circuit court erred in disallowing Crossroads' evidence of community standards, we address all four issues below.

## II

## Standard of Review

¶ 8.　The defendant has challenged Kenosha County Ord. § 9.10.2, and by implication Wis. Stat. § 944.21 (1995–96),[3] upon which the ordinance is

---

[3] All references to the Wisconsin Statutes are to the 1995–96 version unless otherwise noted.

944.21 **Obscene material or performance.** (1) The legislature intends that the authority to prosecute violations of this section shall be used primarily to combat the obscenity industry and shall never be used for harassment or censorship purposes against materials or performances having serious artistic, literary, political, educational or scientific value. The legislature further intends that the enforcement of this section shall be consistent with the first amendment to the U.S. constitution, article I, section 3, of the Wisconsin Constitution and the compelling state interest in protecting the free flow of ideas.

(2)　In this section:

(a)　"Community" means this state.

(b)　"Internal revenue code" has the meaning specified in s. 71.01 (6).

(c)　"Obscene material" means a writing, picture, sound recording or film which:

1.　The average person, applying contemporary community standards, would find appeals to the prurient interest if taken as a whole;

380

modeled, as being unconstitutionally overbroad and vague under the First and Fourteenth Amendments of

2. Under contemporary community standards, describes or shows sexual conduct in a patently offensive way; and

3. Lacks serious literary, artistic, political, educational or scientific value, if taken as a whole.

(d) "Obscene performance" means a live exhibition before an audience which:

1. The average person, applying contemporary community standards, would find appeals to the prurient interest if taken as a whole;

2. Under contemporary community standards, describes or shows sexual conduct in a patently offensive way; and

3. Lacks serious literary, artistic, political, educational or scientific value, if taken as a whole.

(e) "Sexual conduct" means the commission of any of the following: sexual intercourse, sodomy, bestiality, necrophilia, human excretion, masturbation, sadism, masochism, fellatio, cunnilingus or lewd exhibition of human genitals.

(f) "Wholesale transfer or distribution of obscene material" means any transfer for a valuable consideration of obscene material for purposes of resale or commercial distribution; or any distribution of obscene material for commercial exhibition. "Wholesale transfer or distribution of obscene material" does not require transfer of title to the obscene material to the purchaser, distributee or exhibitor.

(3) Whoever does any of the following with knowledge of the character and content of the material or performance and for commercial purposes is subject to the penalties under sub. (5):

(a) Imports, prints, sells, has in his or her possession for sale, publishes, exhibits, or transfers any obscene material.

(b) Produces or performs in any obscene performance.

(c) Requires, as a condition to the purchase of periodicals, that a retailer accept obscene material.

(4) Whoever does any of the following with knowledge of the character and content of the material is subject to the penalties under sub. (5):

(a) Transfers or exhibits any obscene material to a person under the age of 18 years.

(b) Has in his or her possession with intent to transfer or exhibit to a person under the age of 18 years any obscene material.

(5) (a) Except as provided under pars. (b) to (e), any person violating sub. (3) or (4) is subject to a Class A forfeiture.

381

(b)  If the person violating sub. (3) or (4) has one prior conviction under this section, the person is guilty of a Class A misdemeanor.

(c)  If the person violating sub. (3) or (4) has 2 or more prior convictions under this section, the person is guilty of a Class D felony.

(d)  Prior convictions under pars. (b) and (c) apply only to offenses occurring on or after June 17, 1988.

(e)  Regardless of the number of prior convictions, if the violation under sub. (3) or (4) is for a wholesale transfer or distribution of obscene material, the person is guilty of a Class D felony.

(5m)  A contract printer or employe or agent of a contract printer is not subject to prosecution for a violation of sub. (3) regarding the printing of material that is not subject to the contract printer's editorial review or control.

(6)  Each day a violation under sub. (3) or (4) continues constitutes a separate violation under this section.

(7)  A district attorney may submit a case for review under s. 165.25(3m). No civil or criminal proceeding under this section may be commenced against any person for a violation of sub. (3) or (4) unless the attorney general determines under s. 165.25(3m) that the proceeding may be commenced.

(8) (a)  The legislature finds that the libraries and educational institutions under par. (b) carry out the essential purpose of making available to all citizens a current, balanced collection of books, reference materials, periodicals, sound recordings and audiovisual materials that reflect the cultural diversity and pluralistic nature of American society. The legislature further finds that it is in the interest of the state to protect the financial resources of libraries and educational institutions from being expended in litigation and to permit these resources to be used to the greatest extent possible for fulfilling the essential purpose of libraries and educational institutions.

(b)  No person who is an employe, a member of the board of directors or a trustee of any of the following is liable to prosecution for violation of this section for acts or omissions while in his or her capacity as an employe, a member of the board of directors or a trustee:

1.  A public elementary or secondary school.

2.  A private school, as defined in s. 115.001 (3r).

a statute is a question of law that this court reviews *de novo*, without deference to the circuit court or the court of appeals. *State v. Janssen*, 219 Wis. 2d 362, 370, 580 N.W.2d 260 (1998). Ordinances and statutes normally are the beneficiaries of a presumption of constitutionality which the challenger must refute. *Lounge Management, Ltd. v. Town of Trenton*, 219 Wis. 2d 13, 20, 580 N.W.2d 156 (1998). "However, where an ordinance regulates the exercise of First Amendment rights, the burden shifts to the government to defend the constitutionality of that regulation beyond a reasonable doubt." *Id.* (citations omitted.)

## Overbreadth under the Federal Constitution

¶ 9.   Crossroads appropriately makes no serious attempt to argue that the Kenosha Ordinance is at odds with the protections afforded by the First and Fourteenth Amendments under United States Supreme Court precedent in the area of state regulation of obscenity. It is clear from Crossroads' brief that it fundamentally disagrees with that Court's obscenity

3.   Any school offering vocational, technical or adult education that:

a.   Is a technical college, is a school approved by the department of education under s. 38.51 or is a school described in s. 38.51 (9) (f), (g) or (h); and

b.   Is exempt from taxation under section 501(c)(3) of the internal revenue code.

4.   Any institution of higher education that is accredited, as described in s. 39.30(1)(d), and is exempt from taxation under section 501(c)(3) of the internal revenue code.

5.   A library that receives funding from any unit of government.

(9)   In determining whether material is obscene under sub. (2)(c)1. and 3., a judge or jury shall examine individual pictures or passages in the context of the work in which they appear.

(10)   The provisions of this section, including the provisions of sub. (8), are severable, as provided in s. 990.001 (11).

jurisprudence, but in the end must (and does) admit that for the purposes of its overbreadth claim under the federal constitution, the Kenosha ordinance must be sustained.

¶ 10.   The Supreme Court in a line of cases culminating in *Miller v. California*, 413 U.S. 15 (1973), then declared categorically settled "that obscene material is unprotected by the First Amendment." *Id.* at 23 (citing *Kois v. Wisconsin*, 408 U.S. 229 (1972); *United States v. Reidel*, 402 U.S. 351, 354 (1971); *Roth v. United States*, 354 U.S. 476, 485 (1957)); *see also Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 54 (1973) ("This Court has consistently held that obscene material is not protected by the First Amendment as a limitation on the state police power by virtue of the Fourteenth Amendment.")

¶ 11.   Acknowledging first the "inherent dangers of undertaking to regulate any form of expression," the Court explicitly provided that states could regulate obscene materials so long as their statutes were carefully limited. *Miller*, 413 U.S. at 23–24. In the Court's view, a carefully limited regulation would be sufficiently protective of First Amendment values applicable to the states through the Fourteenth Amendment. *Id.* Under the tripartite test it then enunciated, a state may regulate materials as obscene if:

> (a) [ ] 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, *Kois v. Wisconsin*, [408 U.S. 229, 230 (1972)], *quoting Roth v. United States*, [354 U.S. 476, 489 (1957)]; (b) [ ] the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) [ ] the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller*, 413 U.S. at 24–25.

¶ 12.   This court has adopted *Miller* in its evaluations of state obscenity statutes under the federal constitution, *see State v. Princess Cinema of Milwaukee*, 96 Wis. 2d 646, 292 N.W.2d 807 (1980) (the *Miller* standard was used to invalidate, for the violation of First Amendment rights, the forerunner to the current Wis. Stat. § 944.21, enacted in 1988), and the standard was recited by this court with approval as recently as 1994. *See State v. Thiel*, 183 Wis. 2d 505, 523, 515 N.W.2d 847 (1994) (upholding Wis. Stat. § 948.11, **Exposing a child to harmful material,** as a constitutionally valid *adaptation* of the *Miller* obscenity test).

¶ 13.   Further, in our assessment of Wis. Stat. § 944.21 under the federal constitution we are bound by *Miller*, for "[w]hen assessing any First Amendment challenge to a state statute, we are bound by the results and interpretations given that amendment by the decisions of the United States Supreme Court." *Jackson v. Benson*, 218 Wis. 2d 835, 855, 578 N.W.2d 602 (1998) (citing *State ex rel. Holt v. Thompson*, 66 Wis. 2d 659, 663, 225 N.W.2d 678 (1975)); *see also State v. Pitsch*, 124 Wis. 2d 628, 632, 369 N.W.2d 711 (1985) ("when this court interprets a provision of the federal constitution, this court is bound by the interpretations which the United States Supreme Court has given that provision"). *Miller* therefore governs Crossroads' overbreadth claim under the federal constitution, and it is dispositive.

¶ 14.   " 'A statute is overbroad when its language, given its normal meaning, is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate.' "

*Janssen*, 219 Wis. 2d at 374 (*quoting Bachowski v. Salamone*, 139 Wis. 2d 397, 411, 407 N.W.2d 533 (1987)). We have no doubt that Kenosha County Ordinance § 9.10.2 and Wis. Stat. § 944.21 are not overbroad under the federal constitution, for *Miller* explicitly permits states to regulate sexually explicit material in the manner in which Kenosha and Wisconsin have done here.

¶ 15. The *Miller* test has become the basis for many states' obscenity laws, including Wis. Stat. § 944.21 upon which Kenosha County has modeled ordinance § 9.10.2. The Supreme Court offered the *Miller* test as an example of an appropriate limitation upon a state statute governing obscenity that would withstand constitutional scrutiny. *Miller*, 413 U.S. at 25 ("If a state law that regulates obscene material is [limited by our three-pronged test], the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected. . . ."). Both the Wisconsin statute and Kenosha ordinance are virtual adaptations of the *Miller* test.

¶ 16. Crossroads has offered no evidence that the Kenosha ordinance deviates, unconstitutionally, from the *Miller* test. Indeed, Crossroads explicitly acknowledges in its brief that "the three-pronged test for 'obscenity' [is] incorporated into the Kenosha ordinance." Crossroads' point of contention is its disagreement with the Supreme Court's categorical exclusion of obscene materials from First Amendment protection. However, it also accepts *Miller* as good law. Under current obscenity statute analysis as found in *Miller*, the Kenosha County ordinance and Wisconsin statute withstand federal constitutional scrutiny on Crossroads' overbreadth claim, for as currently lim-

ited, neither reaches speech protected by the First Amendment.

## Overbreadth under the Wisconsin Constitution

¶ 17.   Crossroads is much less concerned with the Kenosha County ordinance under the federal constitution than it is with the ordinance under the Wisconsin Constitution, and Crossroads urges this court to assess the validity of the ordinance under the free speech clause of Article I, § 3 of the Wisconsin Constitution.[4] Necessarily, Crossroads argues that in the area of obscenity, the Wisconsin Constitution provides for greater protection of speech than does the First Amendment.

¶ 18.   As noted above, we are bound by *Miller* under an examination of obscenity statutes purportedly affronting the protections of the federal constitution as applied to this state through the Fourteenth Amendment. However, *Miller* provides Wisconsin citizens with but the minimum constitutional protection that must be accorded under the federal constitution. That is, a state statute or county ordinance may not limit sexually explicit materials in a manner more restrictive than that allowed by *Miller*. *See Miller*, 413 U.S. at 23–25.

---

[4] **Section 3. Free Speech libel.** SECTION 3. Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libel, the truth may be given in evidence, and if it shall appear to the jury that the matter charged as libelous be true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

¶ 19. Here, Crossroads would have us find that Wisconsin citizens enjoy more expansive freedoms of speech under the state constitution than they do under the First Amendment and that under the state constitution the state may not limit speech to the extent authorized by *Miller*.

¶ 20. We have previously stated that this court "will not be bound by the minimums which are imposed by the Supreme Court of the United States if it is the judgment of this court that the Constitution of Wisconsin and the laws of this state require that greater protection of citizens' liberties ought to be afforded." *State v. Doe*, 78 Wis. 2d 161, 172, 254 N.W.2d 210 (1977). And, in a few limited circumstances, we have found within our state constitution protections that exceeded those provided our citizens by comparable clauses under the federal constitution. *See e.g., State v. Hansford*, 219 Wis. 2d 226, 242, 580 N.W.2d 171 (1998) (12-member jury is constitutionally required under Wisconsin Constitution, although not under the federal constitution); *Doe*, 78 Wis. 2d at 171–72 (explaining that the state has on occasion accorded criminal defendants broader right to counsel than mandated by the United States Supreme Court under the Fourteenth Amendment to the United States Constitution).

¶ 21. Despite the differences in their language, we have heretofore found no differences in the freedom of speech guarantees provided by the First Amendment and Article I, § 3. Wisconsin courts consistently have held that Article I, § 3 of the Wisconsin Constitution guarantees the same freedom of speech rights as the First Amendment of the United States Constitution. *See Lawson v. Housing Authority*, 270 Wis. 269, 274, 70 N.W.2d 605 (1955); *Jacobs v. Major*, 139 Wis. 2d 492,

407 N.W.2d 832 (1987); *State v. Bagley*, 164 Wis. 2d 255, 260 n.1, 474 N.W.2d 761 (Ct. App. 1991).

¶ 22.   As for the issue before us here, this court has indeed considered the breadth of the protection afforded by Article I, § 3 in the context of obscenity and has concluded that no greater protection exists under the Wisconsin Constitution than under the First Amendment. *See State v. Chobot*, 12 Wis. 2d 110, 106 N.W.2d 289 (1960); *see also State ex rel. Gall v. Wittig*, 42 Wis. 2d 595, 605, 167 N.W.2d 577 (1969) (recognition that the sale of obscene matter is a recognized abuse of the right to speak freely on all subjects and is not protected by either the federal or state constitutions); *Princess Cinema*, 96 Wis. 2d at 655 (court considered the constitutionality of the predecessor to the current Wis. Stat. § 944.21 under backdrop of both the Wisconsin Constitution and the federal constitution making no distinction as to the protections they each accord).

¶ 23.   In *Chobot*, this court expressly considered the constitutionality of the predecessor of the current Wis. Stat. § 944.21, acknowledging from the outset of that decision that both the federal and state constitutional provisions were implicated. *Chobot*, 12 Wis. 2d at 112. There, we explicitly stated that the constitutional provisions involved in determining the constitutionality of the obscenity statute at issue were "Wisconsin Constitution, Article I, Sec. 3" and "Amendments to the United States Constitution."[5] *Id.*

---

[5] Crossroads notes in its brief that following the recitation of the state provision, the provision is not again addressed. Contrary to Crossroads' inference, the absence of a riveting analysis of the language does not negate the force of this opinion: this court has indeed equated the protections of the

¶ 24.	In upholding the constitutionality of the obscenity statute, we relied exclusively upon federal decisions, and in doing so, did not specifically address the language of either the federal or state constitutions. The unavoidable conclusion is that the decision, which relied exclusively upon federal case law to decide the constitutional issue, is that for the purposes of obscenity statutes, we have interpreted the two provisions in an identical manner.

¶ 25.	Further, roughly a third of the state jurisdictions have been asked to interpret their state

Wisconsin provision no differently than the provision of the federal constitution.

While Crossroads is correct that following our recitation of the state constitutional provision we did not specifically refer back to its language, we may not ignore the fact that we did not distinguish the protections accorded our provision from those accorded the federal constitution.

Crossroads too quickly dispatched the relevance of the case to the issue now before us. This court is not in the habit of setting forth the parameters of its decisions only to fully ignore those parameters when deciding its cases. Crossroads' suggestion that *Chobot* is of no precedential value here requires quite the leap of logic. It is a greater leap of logic to consider *Chobot* as Crossroads would have us do, which is that this court, having set forth the issue, ignored or forgot to address the statute's constitutionality under the state constitution. Clearly, this court in 1960 accorded the First Amendment and Article I, § 3 as providing identical protections, and limitations, in the area of obscenity. That we did have clearly before us the Wisconsin Constitution is further supported by the fact that the defendant in the briefs in *Chobot* specifically placed before the court for our consideration the relevant provision of the Wisconsin Constitution.

constitutional free speech clauses to protect obscenity.[6] Only the Oregon Supreme Court has held that its constitution protects obscenity. *State v. Henry*, 732 P.2d 9 (Or. 1987). However, the *Henry* opinion reads as a recital of and quarrel with the United States Supreme Court's obscenity opinions, basing its decision less on principled differences between the language of its constitution and the federal constitution than on what it believes to be a line of poorly-reasoned Supreme Court decisions.

¶ 26. We find that obscenity is and has been an abuse of the right to speak freely on all subjects under the state constitution. The court reserves the right to find that in other areas the Wisconsin constitution may provide Wisconsin citizens with greater protection than does the federal constitution.

### Vagueness

¶ 27. Crossroads also claims that the Kenosha ordinance is unconstitutional due to vagueness under both the federal and Wisconsin Constitutions. A stat-

---

[6] *See State v. Davidson*, 481 N.W.2d 51, 57 (Minn. 1992); *People v. Ford*, 773 P.2d 1059 (Colo. 1989); *City of Urbana ex rel. Newlin v. Downing*, 539 N.E.2d 140, 146 (Ohio 1989); *State v. Reece*, 757 P.2d 947 (Wash. 1988), *cert. denied*, 493 U.S. 812 (1989); *City of Portland v. Jacobsky*, 496 A.2d 646 (Me. 1985); *Com. v. United Books, Inc.*, 453 N.E.2d 406 (Mass. 1983); *People v. Neumayer*, 275 N.W.2d 230, 237 (Mich. 1979); *State v. Lesieure*, 404 A.2d 457 (R.I. 1979); *State v. Manzo*, 573 P.2d 945, 957–58 (Haw. 1977); *Bloom v. Municipal Court*, 545 P.2d 229 (Cal. 1976); *Taylor v. State ex. rel. Kirkpatrick*, 529 S.W.2d 692 (Tenn. 1975); *City of Farmington v. Fawcett*, 843 P.2d 839 (N.M. App. 1992); *Com. v. Stock*, 499 A.2d 308 (Pa. Super. 1985); *Porter v. State*, 440 N.E.2d 690, 692–93 (Ind. App. 1982); *State v. Hollins*, 533 S.W.2d 231 (Mo. App. 1975).

ute is "unconstitutionally vague if it fails to afford proper notice of the conduct it seeks to proscribe or if it encourages arbitrary and erratic arrests and convictions." *Bachowski*, 139 Wis. 2d at 406 (*quoting Milwaukee v. Wilson*, 96 Wis. 2d 11, 16, 291 N.W.2d 452 (1980). The "principles underlying the void for vagueness doctrine. . .stem from concepts of procedural due process." *State v. Popanz*, 112 Wis. 2d 166, 172, 332 N.W.2d 750 (1983). "Due process requires that the law set forth fair notice of the conduct prohibited or required and proper standards for enforcement of the law and adjudication." *Id.*; *see also State v. Ehlenfeldt*, 94 Wis. 2d 347, 355, 288 N.W.2d 786 (1980) (constitutional foundation to a vagueness challenge is the procedural due process requirement of fair notice).

> A vague statute. . .is one which operates to hinder free speech through the use of language which is so vague as to allow the inclusion of protected speech in the prohibition or to leave the individual with no clear guidance as to the nature of the acts which are subject to punishment.

*Princess Cinema*, 96 Wis. 2d at 656. A statute which is vague has the effect of impinging upon three First Amendment values: "(1) it does not provide individuals with fair warning of what is prohibited; (2) lacking precise or articulated standards, it allows for arbitrary or discriminatory enforcement; and (3) it causes citizens to 'forsake activity protected by the First Amendment for fear it may be prohibited.' " *Thiel*, 183 Wis. 2d at 521, n. 9.

¶ 28.  As is true of its overbreadth argument under the federal constitution, Crossroads here admits that precedent requires that this court be bound by Supreme Court decisions and that the *Miller* test embodied in the ordinance provides sufficient notice to

those who wish both to exercise fully their constitutional rights and to avoid committing a criminal offense or ordinance violation.

¶ 29. However, Crossroads would have us find that the Wisconsin Constitution provides greater procedural due process safeguards than does the federal constitution, and that while the ordinance *does* provide sufficient notice under the federal standard, it does not do so under the Wisconsin Constitution. We decline to distinguish the procedural due process requirements of the two constitutions.

¶ 30. Unlike its claim that the Wisconsin and federal constitutions differ as to freedom of speech, here, Crossroads makes no such argument and provides no support for its position that our analysis under the federal constitution should differ from our analysis under the Wisconsin Constitution.

¶ 31. While the language used in the two constitutions is not identical, we have found that the two provide identical procedural due process protections. *State v. Hezzie R.*, 219 Wis. 2d 849, 892, 580 N.W.2d 675 (1998) (citing *Reginald D. v. State*, 193 Wis. 2d 299, 307, 533 N.W.2d 181 (1995)). On more than a few occasions we have expressly held that the due process and equal protection clauses of our state constitution and the United States Constitution are essentially the same:

> Preliminarily, we point out that sec. 1, art. I of the Wisconsin Constitution is framed in language of a Declaration of Rights and reminiscent of the Declaration of Independence, and many times has been held to be substantially equivalent of the due-process and equal-protection clauses of the Fourteenth amendment to the United States constitution. In *Black v. State* (1902), 113 Wis. 205, 89 N.W. 522, the

court said that the section must mean "equality before the law, if it means anything," and, "The idea is expressed more happily in the Fourteenth amendment." Again in *Pauly v. Keebler* (1921), 175 Wis. 428, 185 N.W. 554, it was said in referring to the Fourteenth amendment that the first article of the Declaration of Rights in our constitution was a substantially equivalent limitation of legislative power and "our legislature is bound to accord all persons within its jurisdiction the equal protection of the laws." More recently we reaffirmed the concept that sec. 1, art. I, is to be equated with the Fourteenth amendment in *Boden v. Milwaukee* (1959), 8 Wis. 2d 318, 99 N.W. 2d 156; *Lathrop v. Donohue* (1960), 10 Wis. 2d 230, 102 N.W. 2d 404; and *Haase v. Sawicki* (1963), 20 Wis. 2d 308, 121 N.W.2d 876. Since there is no substantial difference between the two constitutions, we will henceforth refer only to the Fourteenth amendment of the United States constitution.

*State ex rel Sonneborn v. Sylvester*, 26 Wis. 2d 43, 49–50, 132 N.W.2d 249 (1965) (footnote omitted).

¶ 32.  Crossroads argues that Wisconsin recognizes the due process clause under the Wisconsin Constitution, a position with which we are in full agreement. However, as we have not addressed void for vagueness claims in a manner different from the United States Supreme Court, in the absence of a substantive difference between the two constitutions, we see no reason to interpret a void for vagueness challenge under two separate lines of inquiry. We have historically relied upon the United States Supreme Court decisions in the area of void for vagueness challenges, and have done so where a challenge has been made under both the constitutions.

¶ 33. The Supreme Court, in *Miller*, held that procedural due process safeguards were met with the limitations outlined therein. *Miller*, 413 U.S. at 27. As we have held that the Kenosha ordinance has largely adopted the *Miller* standards for obscenity, we find that it is not void for vagueness under either the federal constitution or the Wisconsin Constitution.

¶ 34. So long as the Kenosha ordinance and state statute meet the specific prerequisites as outlined in *Miller*, as we find that they do, dealers in such materials will have fair notice that their "public and commercial activities may bring prosecution." *Miller*, 413 U.S. at 27.

### III

¶ 35. Having decided that Kenosha County Ord. § 9.10.2 does not violate either the federal or Wisconsin Constitutions, we turn next to the question of whether the circuit court erred in modifying the language of the *Miller* obscenity standard when giving instructions to the jury.

¶ 36. A trial judge has great discretion in selecting jury instructions based on the facts and circumstances of the case. *State v. Sartin*, 200 Wis. 2d 47, 52, 546 N.W.2d 449 (1996). "This discretion extends to both choice of language and emphasis." *Id.* (citing *State v. McCoy*, 143 Wis. 2d 274, 289, 421 N.W.2d 107 (1988)). "Although the judge is granted such broad discretion, the question of whether the circuit court correctly instructed the jury is one of law which this court reviews de novo, without deference to the lower courts." *Id.* (*citing State v. Wilson*, 149 Wis. 2d 878, 898, 440 N.W.2d 534 (1989)).

¶ 37. Crossroads contends that the instruction offered the jury departed from constitutional limits first enunciated in *Miller*, 413 U.S. 15, and repeated here:

> The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest. . .; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Id.* at 24. Crossroads concedes that the circuit court did provide the jury with these required elements. It is in defining these elements that Crossroads assigns the circuit court with error, arguing that the circuit court's definitions of the elements impermissibly expanded the scope of obscenity permitting the conviction for non-obscene and therefore constitutionally-protected speech.

¶ 38. The circuit court provided the jurors with the following definition of the first *Miller* prong:

> 'Appealing to the prurient interest' does not encompass normal healthy sexual desires but means the material appeals generally to a shameful, *unhealthy, unwholesome, degrading* or morbid interest in sex, nudity, or excretion.

(Emphasis added.) Crossroads objected that this definition impermissibly expanded the concept of prurience beyond that which is constitutionally permitted. The court overruled Crossroads' objection that the instruction was constitutionally overbroad.

¶ 39. *Miller*, while setting forth the three-pronged test for obscenity, did not define "prurience." *Miller* simply retained without elaborating on, or disagreeing with, the definition of "prurient interest" contained in *Roth*. *Brokett v. Spokane Arcades, Inc.*, 472 U.S. 491, 497–98 (1985). The definition of "prurient interest" as "a shameful or morbid interest in nudity, sex, or excretion" stems back at least as far as the Supreme Court's decision in *Roth* in which the definition of obscenity as developed in the case law was equated with the definition of obscenity in the Model Penal Code:

> "... A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i.e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters...."

*Roth*, 354 U.S. at 487 n.20 (citing Model Penal Code, § 207.10(2) Comment, at 10 (Tent. Draft No. 6, 1957)). This definition has been accepted in the Court's subsequent decisions. *Brockett*, 472 U.S. at 497–98.

¶ 40. Crossroads does not dispute that the *Roth-Brockett* definition of prurience is valid. Crossroads does dispute the circuit court's addition of the words "unhealthy," "unwholesome," and "degrading" to the *Roth-Brockett* formulation of prurient, and believes that by adding such words the definition was expanded beyond that which is allowed by *Miller*.

¶ 41. We find that the addition of these words to the jury instruction of prurience does not expand the definition to encompass protected speech. The words "unhealthy," "unwholesome," and "degrading" appropriately define the term prurient and do not broaden

the subset of materials unprotected by the First Amendment under the *Miller* test. The United States Supreme Court in *Miller* expressly stated that in providing the regime which has become known as the *Miller* test, it was not proposing "regulatory schemes for the States." *Miller*, 413 U.S. at 25. We do not accept the position that to meet the requirements of *Miller*, states cannot deviate in the language used to regulate obscenity.

> The *Miller* cases, important as they were in enunciating a constitutional test for obscenity to which a majority of the Court subscribed for the first time in a number of years, were intended neither as legislative drafting handbooks nor as manuals of jury instructions.

*Hamling v. United States*, 418 U.S. 87, 115 (1974). States simply are not allowed to reach speech beyond that to which *Miller* applies, and we find that the definition of prurience supplied by the circuit court does not reach protected speech.

¶ 42. The terms "unhealthy" and "unwholesome" do not deviate in any significant manner from the term "morbid," which itself is a term that the Supreme Court has accepted as properly defining prurient. *See Spokane*, 472 U.S. at 497–98. The American Heritage Dictionary of the English Language (3d ed., 1992) defines morbid as follows: "1.a. Of, relating to, or caused by disease; pathological or diseased. b. Psychologically *unhealthy* or *unwholesome*. 2. Characterized by preoccupation with *unwholesome* thoughts or feelings." (Emphasis added.) Therefore, we conclude that the addition of these two terms to the definition was not an improper statement of the law.

¶ 43. Likewise, the term "degrading" does not impermissibly expand the definition of prurient. "Degrading" is merely synonymous with "shameful," a term that has been an accepted definition of prurient since at least *Roth*. "[The verb means] to deprive of self-esteem or self-worth. *Degrade* implies reduction to a state of *shame* or disgrace." The American Heritage Dictionary of the English Language, at 491 (emphasis added).

¶ 44. Crossroads similarly argues that the circuit court impermissibly expanded the ordinance beyond its permissible reach by redefining the "value" (third) prong of the *Miller* test. *Miller* set the constitutional limit of the government's power to regulate materials which were obscene and did not have "serious literary, artistic, political, or scientific value." The circuit court instructed the jury that for material to be obscene it must not have "*genuinely* serious [ ] value." (Emphasis added.)

¶ 45. Crossroads contends that in so defining the "value" prong, the circuit court impermissibly reduced the burden Kenosha County bore in prosecuting its case. We disagree. We do not find that the modification of the word "serious" with the word "genuinely" expands the scope of material that the state may regulate. The jury instructions presented to the jury were an accurate statement of the law and as such, resulted in an accurate conviction by the jury.

¶ 46. The circuit court has broad discretion in instructing the jury, *Fischer v. Ganju*, 168 Wis. 2d 834, 849, 485 N.W.2d 10 (1992), so long as the instructions fully and fairly inform the jury of the law. *Jerry M. v. Daniels L.M.*, 198 Wis. 2d 10, 19, 542 N.W.2d 162 (Ct. App. 1995) (citations omitted). The instructions were not misleading to the jury. Taken in light of the overall

meaning communicated by the instructions, the instructions were proper.

## IV

¶ 47. Crossroads next argues that the express purpose and the effect of the county's prosecution against it was to discriminate against Crossroads for the exercise of its right to free speech under the First Amendment and Article I, § 3 of the Wisconsin Constitution. At a minimum, Crossroads believes that it was entitled to an evidentiary hearing on the matter, and preferably, that the charges should have been dismissed because the county engaged in a selective and discriminatory prosecution.

¶ 48. A prosecutor has great discretion in deciding whether to prosecute in a particular case. *See Sears v. State*, 94 Wis. 2d 128, 133, 287 N.W.2d 785 (1980). This court has frequently stated that the "district attorney in Wisconsin is a constitutional officer and is endowed with a discretion that approaches the quasi-judicial." *State v. Johnson*, 74 Wis. 2d 169, 173, 246 N.W.2d 503 (1976) (*citing State v. Peterson* 195 Wis. 351, 359, 218 N.W. 367 (1928)). In accord with this discretion, the prosecutor need not prosecute in all cases where there appears to be a violation of the law. *See Id.*

¶ 49. However, prosecutorial discretion is not wholly unfettered, having, instead, some constitutional limitations. *Wayte v. United States*, 470 U.S. 598, 608 (1985); *Locklear v. State*, 86 Wis. 2d 603, 609, 273 N.W.2d 334 (1979)(the constitution forbids the discriminatory enforcement of laws). The decision to prosecute may not be "deliberately based upon an unjustifiable

standard such as race, religion," or the exercise of protected statutory or constitutional rights. *Wayte*, 470 U.S. at 608 (citations omitted). Under *Wayte*, a court may judge a discriminatory prosecution claim according to ordinary equal protection standards. *Id.* These standards require a petitioner to show that the prosecution "had a discriminatory effect and. . .was motivated by a discriminatory purpose." *Id.* at 598.

¶ 50.    Before it is entitled to a full evidentiary hearing, Crossroads must first present a *prima facie* showing of discriminatory prosecution. *See State v. Nowakowski*, 67 Wis. 2d 545, 565–66, 227 N.W.2d 697 (1975); *see also Jarrett v. United States*, 822 F.2d 1438, 1443 (7th Cir. 1987)(citations omitted); *United States v. Kerley*, 787 F.2d 1147 (7th Cir. 1986). A *prima facie* showing requires that at a minimum the defendant prove that he or she has been singled out for prosecution while others similarly situated have not, and that the prosecutor's discriminatory selection was based on an impermissible consideration such as race, religion or the exercise of constitutional rights. *Kerley*, 787 F.2d at 1148.

¶ 51.    We find that Crossroads has failed to make the required showing under either prong. In order to satisfy the discriminatory effect prong, a court should look to see if a similarly situated person is generally not subject to prosecution. *See Johnson*, 74 Wis. 2d at 173 ("A basic consideration to the question of equal protection in the enforcement of laws is that 'all persons similarly circumstanced shall be treated alike.' "); *see also State v. McCollum*, 159 Wis. 2d 184, 197–98, 464 N.W.2d 44 (Ct. App. 1990); *United States v. Aguilar*, 883 F.2d 662, 705–706 (9th Cir. 1989).

¶ 52. The *Aguilar* court offered a helpful method of applying this prong. *Aguilar* suggested the use of a control group in order to determine whether the pattern of prosecution has discriminatory effect. *Aguilar*, 883 F.2d at 706. The proper control group will be akin to the defendant in *every* way except for a variable. *Id.*

¶ 53. As the *Aguilar* court stated, the purpose of identifying the appropriate control group is to:

> isolate the factor allegedly subject to impermissible discrimination. The similarly situated group is the control group. The control group and defendant are the same in all relevant respects, except that defendant was, for instance, exercising his first amendment rights. If all other things are equal, the prosecution of only those persons exercising their constitutional rights gives rise to an inference of discrimination. But where the comparison group has less in common with defendant, then factors other than the protected expression may very well play a part in the prosecution.

*Id.*

¶ 54. In this instance, Crossroads has identified the group of "similarly situated" as all video stores in Kenosha County selling or renting videotapes comparable to those alleged to be obscene in this case. This group includes all three video stores initially prosecuted for selling obscene videos as well as nine other "mainstream" video stores in the county.

¶ 55. In alleging that the other video stores have comparable sexually explicit videos, Crossroads implicitly admits that the nine "mainstream" video stores are exercising the same First Amendment rights to provide sexually explicit materials that Crossroads is, albeit they do so with less vigor. However, the quantity or quality of the variable is not the touchstone to an equal

protection claim, it is the presence of a variable in one prosecution and the absence in those not prosecuted that is determinative.

¶ 56. According to Crossroads, the variable upon which its prosecution was based and which gives rise to the inference of impermissible discrimination is that only those stores *specializing* in sexually explicit (though perhaps not obscene) materials, and advertising on an interstate highway, have been prosecuted. The video stores in the "control group" do not *specialize* in these videos, although they do sell and rent such videos. Crossroads claims that the discrimination is "thus squarely based upon the defendant's exercise of its First Amendment rights to sell sexually explicit materials which are, after all, 'presumptively protected by the First Amendment.' "

¶ 57. Here, Crossroads provided no preliminary showing that those similarly situated were not prosecuted because they were not exercising their First Amendment rights as was Crossroads. Under the circumstances, such a claim would be quite difficult, as its allegation implicitly demonstrates that the stores which were not prosecuted were indeed exercising the same First Amendment rights that Crossroads itself is.

¶ 58. A showing under the discriminatory effect prong necessarily requires the presence of some variable which demonstrates that a member of a suspect class or individual exercising a fundamental right is being prosecuted while those not in the suspect class, or not exercising their fundamental rights, are not prosecuted. Only if Crossroads could show that *it* was prosecuted for exercising its right to sell protected sexually explicit material while the others *did not* exercise that same right could they have successfully established the first prong of their claim. Here, both the

prosecuted and unprosecuted are exercising their First Amendment rights to sell sexually explicit material.

¶ 59. Kenosha County engaged in what is an appropriate use of selective prosecution. Selective prosecution has two meanings in the law:

> The first is simply failing to prosecute all known lawbreakers, whether because of ineptitude or (more commonly) because of lack of adequate resources. The resulting pattern of nonenforcement may be random, or an effort may be made to get the most bang for the prosecutorial buck by concentrating on the most newsworthy lawbreakers, but in either case the result is that people who are equally guilty of crimes or other violations receive unequal treatment, with some being punished and others getting off scot-free. That form of selective prosecution, although it involves dramatically unequal legal treatment, has no standing in equal protection. (citations omitted). The second form of selective prosecution, and the only one that is actionable under the federal Constitution, is where the decision to prosecute is made either in retaliation for the exercise of a constitutional right, such as the right to free speech or to the free exercise of religion, or because of membership in a vulnerable group.

*Esmail v. Macrane*, 53 F.3d 176, 178–79 (7th Cir. 1995). It is this first meaning of selective prosecution that Crossroads has objected to, and for which there can be no judicial remedy.

¶ 60. We believe the Fourth Circuit correctly identified the proper inquiry under the discriminatory effect prong in a case such as this: "defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that

might justify making prosecutorial decisions with respect to them." *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996).

¶ 61.   Crossroads' proffer reveals a number of factors which must necessarily enter into prosecutorial discretion: namely, the near-exclusive sexually explicit nature of the materials sold by Crossroads and Crossroads' prominent location along a heavily-traveled interstate highway. These are the "distinguishable legitimate prosecutorial factors" we expect a prosecutor to consider in determining his or her priorities in charging those who are involved in illegal activity.

¶ 62.   There is, we may all agree, a fine line between sexually explicit material that is within the protection of the First Amendment and material which is obscene. However, a prosecutor does not abuse his or her discretion when he or she targets those businesses which most publicly present their sexually explicit material.

¶ 63.   It is within Kenosha County's right to regulate obscene materials in accordance with *Miller*. The county may also "crack down" on obscenity, or any other activity which is in violation of its county ordinances. While this court is in no position to know what percentage of Crossroads' sexually explicit materials are obscene and in violation of the Kenosha ordinance, we can find nothing wrong with a prosecutor whose first attempts at enforcing a county ordinance focus upon those businesses whose inventory is largely made up of such material. If indeed the line between the obscene and the non-obscene is finely drawn, prosecutors will undoubtedly find more violations of the ordinance at those places where nearly all the materials are sexually explicit than they will at mainstream video stores. Further, the advertisement and place-

ment of these businesses on the interstate make them highly visible targets, presumably unlike the other video stores. Targeting them can be seen as "getting the most bang for the prosecutorial buck." *Esmail*, 53 F.3d at 178. With these differences, Crossroads has failed to meet its burden in making a *prima facie* showing of discriminatory effect.

¶ 64. Nor has Crossroads adequately established a discriminatory purpose behind the prosecutor's decision to prosecute it and two others. It alleges that the prosecutor stated that he intended to put the bookstore out of business, and offered as evidence of the statement newspaper clippings from Kenosha County. However, in those same clippings, the prosecutor states *why* he intended to put the stores out of business: because in his opinion as a prosecutor he believes that the bookstores have been in violation of the obscenity ordinance since it was first passed. "Our feeling is that most of the inventory probably violates the obscenity ordinance," the assistant district attorney was quoted as stating.

¶ 65. These statements do not indicate an improper prosecutorial motive. Obscenity is not protected speech and prosecutors may rightly target purveyors of obscenity, just as they may target those violating other civil and criminal statutes. They may even use the newspapers as a means to notify those who are guilty of such violations that they will be targeted. The same newspaper clippings attached to the affidavit also make abundantly clear that Kenosha County went through a lengthy political process in acquiring an assistant district attorney to prosecute violations of the Kenosha County obscenity ordinance. No evidence was provided by Crossroads that the district attorney was prosecuting the obscenity violation

because the district attorney disagreed with the protected, sexually explicit material that Crossroads sold. Therefore, no improper motivation may be attributed to the assistant district attorney.

¶ 66. That the district attorney selected the defendant's business because of its prominent location at the entryway to the state was a legitimate use of his power. Further, if the district attorney made an incorrect decision, it was a political decision, not one to be reviewed by this court.

## V

¶ 67. The final issue we address is whether the circuit court erred by excluding evidence offered by Crossroads as proof of community standards. Specifically, Crossroads sought admission of a telephone survey purporting to establish community standards in Wisconsin with respect to sexually explicit materials, the expert testimony of Dr. Joseph Scott, and numerous video tapes which Crossroads alleged were materials comparable to "Anal Vision No. 5."

¶ 68. Upon review of evidentiary issues, this court does not consider the issues *de novo*, but instead must determine whether the circuit court properly exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record. *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983). The test is not whether this court agrees with the circuit court's ruling, but rather, whether the circuit court properly exercised its discretion. *Id.* The circuit court does not erroneously exercise its discretion where its determination has a reasonable basis. *Id.* To be upheld, however, a discretionary decision must be supported by "evidence in the record that discretion was in fact exercised and the basis of that

exercise of discretion should be set forth." *Id.* (quoting *State v. Hutnik*, 39 Wis. 2d 754, 764, 159 N.W.2d 733 (1968)).

## The Telephone Survey

¶ 69.   Crossroads made a proffer of a telephone survey as evidence of statewide community standards in the area of sexually explicit material. With respect to the survey responses which are material to this appeal, survey respondents were first read the following passage:

> The next few questions deal with adult x-rated videos and sexually explicit magazines. These videos and magazines may have little or no plot. Their contents are primarily graphic depictions of nudity and sex, showing a variety of actual sexual activities, including: vaginal intercourse, ejaculation, bondage, oral sex, masturbation, anal sex, use of vibrators, lesbian sex, group sex and variations of these by adult performers. No minors are involved, and these materials can only be purchased, rented or viewed by adults who desire them.

Respondents were to consider this passage when opining as to the following questions: 1) whether Wisconsin standards had changed to the extent that nudity and sex in magazines and videos were "more or less acceptable today than in recent years;" 2) whether the portrayal of sexual conduct in videos and magazines is acceptable for adults who want to obtain them; 3) whether it is acceptable for "such videos and magazines to be sold or rented to adults;" 4) whether, as adults themselves, the respondents should be able to legally obtain and view such videos and magazines; 5) whether neighborhood video stores should be allowed to rent or

sell such videos to adults; 6) whether the respondent's viewing of depictions of actual sex acts, including close-ups of sexual organs, would appeal to his or her own "shameful, morbid, or unhealthy interest in sex;" and 7) whether the same would appeal to their best friend's "shameful, morbid, or unhealthy interest in sex."

¶ 70. Kenosha County objected to the introduction of this evidence, and the circuit court, following its thoughtful deliberation, refused to admit the evidence on grounds that the survey was not relevant to the question of whether "Anal Vision No. 5" was obscene and that the admission of the survey would tend to confuse the jury. The circuit court did not erroneously exercise its discretion in reaching these conclusions.

¶ 71. Expert testimony on the question of community standards is not constitutionally required, *Hamling*, 418 U.S. at 104, although we admit that evidence of community standards may be helpful to a jury in its deliberation. As Justice Frankfurter stated in his concurring opinion in *Smith v. People*, 361 U.S. 147 (1959):

> The determination of obscenity no doubt rests with judge or jury. Of course the testimony of experts would not displace judge or jury in determining the ultimate question whether the particular book is obscene, any more than the testimony of experts relating to the state of the art in patent suits determines the patentability of a controverted device.
>
> There is no external measuring rod for obscenity. Neither, on the other hand, is its ascertainment a merely subjective reflection of the taste or moral outlook of individual jurors or individual judges. Since the law through its functionaries is 'applying contemporary community standards' in determining what constitutes obscenity, *Roth v. United*

*States*, 354 U.S. 476, 489,. . .it surely must be deemed rational, and therefore relevant to the issue of obscenity, to allow light to be shed on what those 'contemporary community standards' are.

*Id.* at 165.

¶ 72.   When properly conducted, a survey may be admitted for the purpose of shedding light on community standards. However, telephone surveys which ask respondents to opine about the availability and acceptance of "actual depictions of sexual activity" in magazines and videos in their communities are not relevant to the determination of obscenity in a *particular* instance, particularly where the respondent is to opine about sexually explicit material in the abstract.

¶ 73.   The Seventh Circuit has offered a sensible approach to the use of surveys on this question: "If surveys are to be used, they must be taken in the relevant area; they must address material clearly akin to the material in dispute, and they must be good studies by the usual standards." *United States v. Various Articles of Merchandise*, 750 F.2d 596, 599 (7th Cir. 1984). The second of these three prongs, in particular, ensures that the survey is relevant with respect to the material for which the prosecution began. *See United States v. Pryba*, 678 F. Supp. 1225, 1229 (E.D. Va. 1988) ("To be admissible, however, a public opinion poll must be relevant; it must ask questions concerning the materials involved in the case or works that are 'clearly akin' to the charged materials").

¶ 74.   The requirement states the obvious. To be admissible, evidence must be relevant. Wis. Stat. § 904.02. Relevant evidence is that which has any tendency to make the existence of any fact that is of consequence to the determination of the action more

probable or less probable than it would be without evidence. Wis. Stat. § 904.01. In an obscenity trial, to be admissible as relevant, we hold that a survey must bear a strong relationship to the type of material that is charged in the case or to works that are "clearly akin" to the charged material. *Various Articles*, 750 F.2d 596.

¶ 75. In the instant case, as the circuit court determined, the innocuous description of the types of activities the survey respondent was to consider is too far removed from the graphic scenes of sexual activity in "Anal Visions No. 5" to be relevant on the question of whether that particular video is obscene.

¶ 76. In this survey, the description of sexual activities that a survey respondent is to consider, as well as the follow-up questions, are not materially different from those asked in the survey which was the result of the appeal in *Pryba*, 678 F. Supp. 1225. As that court noted, two problems emerge from the survey: first, the surveys do "not question respondents regarding the materials at issue or similar materials, but rather inquire [ ] into their opinions on the viewing of 'nudity and sex,' defined broadly." *Id.* at 1229. Second, the questions are not directed at determining whether sexually explicit material enjoys community acceptance. *Id.* at 1230.

¶ 77. The most serious problem in this survey and other "abstract" surveys is that they do not describe with any verisimilitude the sexual activities depicted in this video and for which the current prosecution is brought. The bland, "descriptive" language of this survey does not adequately describe the impact of the visual images provided in "Anal Vision No. 5." *See id.*, at 1229–30. Here, the circuit court believed that the survey language did not adequately convey to those responding to the survey the scenes from within this

film to make the survey relevant to the question of community standards on obscenity.

¶ 78. Therein lies the inherent difficulty in using telephone surveys to assess the prevailing community standards on the issue of obscenity. Survey questions such as the ones used in this survey simply do not convey the degree of sexual explicitness that the video images of the film in this case do. Here, particularly, truth rings loudly in the oft-used phrase "a picture is worth a thousand words." As the circuit court noted, there are no doubt those who will reply in one manner when responding to a short survey description containing the mechanical terms "fellatio or cunnilingus or sexual intercourse," and may have a much different response following their review of these activities displayed in a video.

¶ 79. Because the survey respondents were not "sufficiently apprised of the nature of the charged materials, the responses to the poll [are] irrelevant to the issues involved in this case." *Pryba*, 678 F. Supp. at 1229–30. The survey is "not probative on whether the charged materials enjoy community acceptance."

> The survey questions merely inquired as to general opinions concerning the depiction of 'nudity and sex,' defined as 'exposure of the genitals and sexual activity,' and whether adults should have the opportunity to obtain such materials. . . .Whether or not 76 of 100 persons would say that the change in 'standards' over recent years in the depiction of nudity and sexual activities is 'more acceptable' does not show that those same persons would find that the [materials] in question depicted sex and nudity in an 'acceptable' manner. There was no attempt in the survey itself to determine whether the respondents were of the opinion that the con-

tents of the [materials at issue] would or would not exceed the limits of permissible candor in the depiction of 'nudity and sex.'

*Id.* at 1229 (*quoting Flynt v. Georgia*, 264 S.E.2d 669, 672 (Ga. App. 1980)).

¶ 80.   The view that we adopt today is shared by numerous other state and federal courts, as the failure of a defendant to demonstrate how an abstract question regarding the availability of sexually explicit materials relates to the material for which prosecution is being sought. *See Commonwealth v. Trainor*, 374 N.E.2d 1216 (Mass. 1978) (the absence of any connection between the willingness, the lack of willingness, or the indifference of a group to the sale of sexually explicit magazines of the showing of sexually explicit films and whether the particular sexual conduct involved in the case was depicted in a patently offensive manner made the survey evidence irrelevant); *see also State v. Roland*, 362 S.E.2d 800, 804 (N.C. App. 1987) (evidence of survey responses following questions dealing primarily with public tolerance of sexually explicit materials in general, rather than with acceptance of the materials under scrutiny, was properly disallowed as being irrelevant); *State v. Williams*, 598 N.E.2d 1250, 1257 (Ohio App. 1991) ("On the issue of relevance, the poll must be relevant to a determination of both community standards in general and the community's acceptance of viewing the *particular* film in question." (emphasis supplied)).

¶ 81.   We find that a relevant survey must also address whether the *material at issue* depicts sexual acts in a patently offensive manner, and whether the *material at issue* appeals to the prurient interest. *See United States v. Pryba*, 678 F. Supp. at 1229 (citing

413

*Various Articles*, 750 F.2d at 599); *Trainor*, 374 N.E.2d at 1220. *Flynt*, 264 S.E.2d 669.

¶ 82.    The circuit court judge expressed a concern that the reference in the survey to "graphic depiction[s]" of various sexual acts did not describe the material in question. He further concluded that had the survey respondents been shown "Anal Vision No. 5," the survey may have had some value, but absent that showing, it did not. The court did not erroneously exercise its discretion when it ruled that if the survey were admitted, there was a substantial risk of confusing the jury thereby precluding its admissibility.

¶ 83.    Crossroads' survey failed to both seek and elicit information regarding the patent offensiveness and the prurient appeal of the depiction at issue in this case. To the contrary, the survey sought to elicit an opinion about (1) whether consenting adults should have the right to rent or purchase films showing "nudity and sex," (2) whether the customer has a prurient interest when and if viewing "nudity and sex," and (3) whether nudity and sex in movies has become more or less acceptable in recent years. These three inquiries were irrelevant as decided by the court.

¶ 84.    In actuality, the survey consisted of the "consenting adult" defense which the United States Supreme Court rejected in *Paris Adult Theatre I*, 413 U.S. 49. Here, the circuit court judge noted that the survey "dealt with whether [survey respondents] felt [sexually explicit material] should be available to those who want to look at it, which is a different question altogether as to whether this work is obscene. . . ." The fact that materials are distributed to willing, consenting adults is no defense to the distribution of obscenity. *See Paris Adult Theatre I*, 413 U.S. at 57

("We categorically disapprove the theory, apparently adopted by the trial judge, that obscene, pornographic films acquire constitutional immunity from state regulation simply because they are exhibited for consenting adults only"). The circuit court did not erroneously exercise its discretion in refusing to admit the survey.

¶ 85. As for the expert testimony of Dr. Scott, absent the community survey, his testimony is not relevant to the question of community standards. In any event, expert testimony regarding community standards is not required in an obscenity determination. *See Paris Adult Theatre I*, 413 U.S. 49, 56.

> This not a subject that lends itself to the traditional use of expert testimony. Such testimony is usually admitted for the purpose of explaining to lay jurors what they otherwise could not understand. . . .No such assistance is needed by jurors in obscenity cases; indeed, the "expert witness" practices employed in these cases have often made a mockery out of the otherwise sound concept of expert testimony.

*Id.* at 56 n.6 (citations omitted). We agree with the Supreme Court that obscenity is not a subject that lends itself to the traditional use of expert testimony, and that "films, obviously, are the best evidence of what they represent." *Id.*

## "Comparable" Videos

¶ 86. Crossroads also appeals the circuit court's decision finding inadmissible evidence of videos Crossroads alleged were "comparable" to "Anal Vision No. 5." Crossroads' proffer consisted of two categories of videos: first, two sexually explicit videos which in previous litigation involving the Kenosha ordinance, the

videos were found to be non-obscene by a jury. Second, six sexually explicit videos purchased or rented in Kenosha County and which Crossroads alleged were comparable to "Anal Vision No. 5."

¶ 87.   The circuit court did not erroneously exercise its discretion in disallowing videotapes from either grouping. "If consistency in jury verdicts as to the obscenity *vel non* of identical materials is not constitutionally required, *Miller v. California*, [ ], the same is true *a fortiori* of verdicts as to separate materials, regardless of their similarities." *Hamling*, 418 U.S. at 101. The presentation of the two videos which were found not to be obscene in prior jury trials could only work to confuse this jury.

¶ 88.   Further, as to the six "comparable" videos, it is axiomatic that community tolerance or availability does not equate with acceptability or non-obscenity. *See Pryba*, 678 F. Supp. at 1230. The mere availability of the material is not indicative of community standards. All these video tapes *could be* obscene, just as the jury found that "Anal Vision No. 5" was.

¶ 89.   Finally, as the circuit court found, the video tapes here which were offered as evidence were not comparable to "Anal Vision No. 5." The video tape itself is the best evidence of its obscenity, *Paris Adult Theatre I*, 413 U.S. at 56, and the circuit court did not erroneously exercise its discretion in declining to allow the other tapes as evidence of community standards.

*By the Court.*—The judgment of the Kenosha County Circuit Court is affirmed.